## Logan Valley Plaza, Inc. v. Amalgamated Food Employees Union, Local 590, Appellant.

Argued October 6, 1966.   Before Bell, C.J., Mus-
manno, Jones, Cohen, Eagen, O'Brien and Roberts,
JJ.

*John R. Strawmire,* with him *Emil Narick,* for
appellants.

*Robert Lewis,* with him *Jackson, Lewis & Schnitz-
ler,* of the New York Bar, and *Sidney Apfelbaum* and
*John Woodcock, Jr.,* for appellees.

Opinion by Mr. Justice Jones, March 21, 1967:
This appeal challenges the grant of injunctive re-
lief the effect of which was to restrain certain picket-
ing concededly peaceful in nature.

Logan Valley Plaza, Inc., (Logan), owns a newly-
developed and large shopping center, known as the
Logan Valley Mall, located at the intersection of two
public highways in Logan Township near the City of
Altoona, Blair County.   At the time of the events re-
lated, at this shopping center only two stores were
occupied, one by Weis Markets, Inc. (Weis), a concern
engaged in the sale of food and sundry household

articles, and the other occupied by Sears department store and automobile service station.[1] The Weis property consists of the store proper, a porch and, directly in front of the porch, a parcel pick-up zone for the loading of purchased goods into customers' cars.[2] Directly in front of the Weis property is a very large parking lot extending toward two public highways from which highways there are entrances and exits to and from the parking lot. The parking area is owned by Logan and provided for the use of Weis, Sears and any future occupants of store properties in the shopping center. Separating this parking area from the several public highways is a fifteen foot berm.

Weis—whose employees are not union members and were not picketing—opened for business on December 8, 1965 and, eleven days thereafter, four pickets, members of Amalgamated Food Employees Union, Local 590, AFL-CIO, (Union), appeared.[3] The pickets—ranging in number from 4 to 13—walked back and forth in front of the Weis store, occasionally on the porch of the store but usually in the parcel pick-up zone, on the parking lot and on the berms near the property entrances and exits. The court below found, and it is established by the evidence, that the picketing was peaceful in nature.

---

[1] Sears is not a party to this litigation.

[2] This area—approximately 4-5 feet in width and 30-40 feet in length—is marked off with yellow lines and is directly in front of the porch.

[3] The pickets—employees of nearby Atlantic & Pacific stores which are competitors of Weis—carried signs reading "Weis Market is Non-Union, these employees are not receiving union wages or other union benefits" and they passed out handbills which stated—"We appeal to our friends and members of organized labor NOT TO PATRONIZE this non-union market . . . . Please Patronize Union Markets! A & P—QUAKER—ACME . . . . We still retain the right to ask the public NOT to patronize non-union markets and the public has the right NOT TO PATRONIZE non-union markets."

Ten days after the picketing began, Weis and Logan instituted an equity action in the Court of Common Pleas of Blair County and that court, *ex parte,* issued a preliminary injunction against the Union. That injunction restrained the Union from: (1) picketing and trespassing on Weis' property, i.e., the store proper, the porch and the parcel pick-up area; (2) picketing and trespassing upon Logan's property, i.e., the parking area and entrances and exits thereto; (3) physically interfering with Weis' business invitees entering or leaving the store or parking area; (4) violence toward Weis' business invitees; (5) interference with Weis' employees in the performance of their duties.[4] Four days thereafter, a hearing was held on a motion to continue the injunction and, after hearing, the court entered a decree continuing the preliminary injunction. From that decree the instant appeal was taken.

The rationale of the decision in the court below was two fold: (a) that the picketing was upon private property and, therefore, unlawful in manner because it constituted a trespass; (b) that the aim of the picketing was to compel Weis to require its employees to become members of the Union and, therefore, the picketing, albeit peaceful, was for an unlawful purpose.

Our scope of review is well settled. In *Philadelphia Minit-Man Car Wash Corp. v. Building and Construction Trades Council of Phila. & Vicinity,* 411 Pa. 585, 588, 589, 192 A. 2d 378 (1963), we said: "The validity of the preliminary injunction is determined by the well-established rule repeated in Mead Johnson & Co.

---

[4] The practical effect was to restrict picketing to the berm areas near the entrances and exits, picketing which could be carried on without danger from traffic on the public highways. The court did attempt, apparently, to limit the number of pickets but the record does not reveal how many pickets were allowed.

v. Martin Wholesale Distributors, Inc., 408 Pa. 12, 19, 182 A. 2d 741, 745 (1962) : ' " " 'Our uniform rule is that, on an appeal from a decree which refuses [or] grants . . . a preliminary injunction, we will look only to see if there were any apparently reasonable grounds for the action of the court below, and we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the rules of law relied on are palpably wrong or clearly inapplicable: [Citing authorities].' " ' "

The Union contends that the court below erred in ruling that the picketing constituted a trespass upon private property of Weis and Logan and urges that the parcel pick-up area and the parking lot were not private, but quasi-public, property.[5]

That the Commonwealth has not only the power but the duty to protect and preserve the property of its citizens from invasion by way of trespass is clear beyond question: *Thornhill v. Alabama,* 310 U.S. 88, 105, 60 S. Ct. 736 (1940) ; *City Line Open Hearth, Inc. v. Hotel, Motel & Club Employees' Union,* 413 Pa. 420, 431, 197 A. 2d 614 (1964) ; *Wortex Mills, Inc. v. Textile Workers Union of America, CIO,* 369 Pa. 359, 363, 364, 85 A. 2d 851 (1952). Our immediate inquiry is whether, in the factual matrix of the case at bar, the conduct of these pickets constituted an invasion of the private property of Weis and/or Logan. Do the parcel pick-up zone and the parking areas constitute private or quasi-public property?

Our research does not disclose that we have ever determined whether the property in a shopping center,

---

[5] We do not construe the Union's position to be that picketing on the porch of the Weis' property did not constitute a trespass. Our reading of the record indicates that the picketing that did take place on the porch was sporadic at most and that the Union itself discouraged such picketing.

accessory to its main purposes, constituted private or quasi-public property. Resolution of that question involves the consideration of many factors. There is no doubt that this shopping center was not conveyed, donated or otherwise dedicated to the public use generally; neither the record nor common sense would justify such a finding. Both Weis and Logan, the former in opening its store and the latter in creating its shopping center as an area upon which commercial enterprises would be conducted, fully anticipated that that portion of the public interested in patronage of Weis' store and the other commercial enterprises, opened and expected to be opened, would not only enter the stores but would utilize fully the parking and the parcel pick-up facilities of the center. The provision of such facilities furnishes attractive features in the complex of the shopping center to attract potential shoppers. The success of both Weis' store and the Logan shopping center depends upon the extent to which both are able to induce and persuade the public to visit and shop in the area. Both Weis and Logan, by their provision of the parking and pick-up facilities impliedly invited the public to utilize such facilities.. However, that invitation to the public was not without restriction and limitation; it was not an invitation to the general public to utilize the area for whatever purpose it deemed advisable but only to those members of the public who would be potential customers and possibly would contribute to the financial success of the venture.

The invitation to the public, extended by the operation of the parking area and parcel pick-up area, was limited to such of the public who might benefit Weis' and Logan's enterprises, including potential customers as well as the employees of the shopping center concerns. That the invitation to the public was general,

as the Union implicitly urges, offends the common sense of the matter.

Moreover, in the case at bar, that Weis had taken special precautions against an indiscriminate use of its property is evident from this record. It had posted a sign on its property which stated "No trespassing or soliciting is allowed on Weis Market porch or parking lot by anyone except Weis employees without the consent of the management". A general invitation to certain classes of persons to use the premises and the exclusion of certain other classes of persons from such use is fully consistent with the right of a property owner to the use and enjoyment of his property. See: *Adderley v. Florida,* 385 U.S. 39, 48, 87 S. Ct. 242, 247 (1966). Those who were picketing Weis' and Logan's property certainly were not within the orbit of the class of persons entitled to the use of the property.

Great reliance is placed by the Union on *Great Leopard Market Corporation, Inc. v. Amalgamated Meat Cutters and Butcher Workmen of North America,* 413 Pa. 143, 196 A. 2d 657 (1964). In *Great Leopard,* seven employees of Great Leopard went on strike and the picketing was conducted by blocking the sole driveway entrance to the supermarket and a foot-bridge which connected a municipal parking lot and the supermarket property. We were of the opinion that the terms of the injunction were too broad and modified the injunction to permit picketing in the front and the rear of the supermarket. In *Great Leopard,* we did not determine either the status of the supermarket property nor whether the employees were trespassers. Moreover, it is to be noted that the pickets were employees of the supermarket whereas in the case at bar the pickets were not and never had been employees of Weis. In our view, *Great Leopard* is not controlling of the instant appeal.

While both Weis and Logan granted to a segment of the public certain rights in connection with the use of their property, such cession of rights did not constitute a grant of all their rights to all the public. To hold that these property owners solicited the use of their property by persons who were attempting to discourage the public from patronizing the store facilities lacks any basis in law or common sense. These pickets, even though engaged in picketing of a peaceful nature, had no right or authority whatsoever to utilize the private property of Weis and/or Logan for such picketing purposes; such use constituted a trespass which very properly was restrained.

The court below had reasonable grounds upon which to grant injunctive relief in the factual situation presented upon this record.

In view of the conclusion reached, we deem it unnecessary to determine whether the instant picketing was for an unlawful purpose.

Decree affirmed. Appellants pay costs.

Mr. Justice MUSMANNO dissents.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

The majority opinion determines that because the picketing occurred on private property it constituted a trespass and, as such, was properly enjoined by the court below. The majority have chosen to regard the rights attendant to private ownership of property but not the burdens which attach thereto. Throughout the law, there is recognized the principle that even owners of private property must observe and conform to certain community standards in the use and maintenance of their land, as witness the law of nuisance, zoning and negligence of property owners. And, most especially, as witness the law of labor relations. In *Thornhill v. Alabama,* 310 U.S. 88 (1940), the United

States Supreme Court held that peaceful picketing is entitled to the same constitutional protection as other forms of free speech. In *Thornhill*, the pickets were employees of the picketed employer, with whom they had a labor dispute. Only a year later, the Supreme Court extended the constitutional protection under *Thornhill* to a situation wherein the pickets were not employees of the picketed establishment but were members of a union which had unsuccessfully attempted to organize the establishment's employees. *A.F.L. v. Swing*, 312 U.S. 321 (1941). Such "stranger picketing" is, therefore, constitutionally protected. The instant matter cannot be resolved by an analysis limited to the rights associated with private property. Concomitant to these rights are certain restrictions, one of which is that freedom of speech and freedom of the press often require that the rights of private ownership yield. In *Marsh v. Alabama*, 326 U.S. 501 (1946), the Supreme Court stated, "Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." 326 U.S. at 506. In *Marsh*, the Court held that the constitutional guarantees of freedom of the press and of religion precluded the enforcement of a state criminal statute against a Jehovah's Witness who distributed religious literature on a street of a company owned town. The Court reasoned that because the street was opened to the public in general and, though privately owned, served a public function, private management could not curtail precious constitutional liberties.

In the sense that both are freely accessible to the public, a company town and a shopping center are analogous arrangements, and for purposes of consider-

ing possible constitutional abridgments should be similarly analyzed. Accordingly, I deem unincisive the majority's failure to recognize any conflict between the rights of private ownership and the constitutionally guaranteed freedoms of speech and of the press. Just as there exists a conflict between the right to distribute printed religious matter in a company town and a statute restricting such activity, so too there exists a conflict between a union's right to picket peacefully and a shopping center's policy not to permit such activity within the boundaries of the center. Only by a thorough consideration of these conflicting values can the issue herein presented be properly resolved.

A case involving a related issue is *Marshall Field & Co. v. NLRB*, 200 F. 2d 375 (7th Cir. 1953), wherein the Seventh Circuit decided that a company owned street which divided the store and which was used only occasionally by employees and customers to enter the store, partook of the nature of a city street to an extent sufficient to invalidate a company rule prohibiting non-employees from engaging in union activity in the street. As one observer commented, shopping center grounds are possessed of more attributes of a public way than the Marshall Field owned street because the public would use the shopping center public ways to a far greater extent than it could use the company owned street. Note, Shopping Centers and Labor Relations Law, 10 Stanford L. Rev. 694, 701 (1958).

Perhaps the most sensible appraisal of what an appellate court must know to decide a shopping center picketing case was set forth in two cases: (1) *Moreland Corporation v. Retail Store Employees Union Local No. 444, AFL-CIO*, 16 Wis. 2d 499, 114 N.W. 2d 876 (1962), wherein the Supreme Court of Wisconsin in an action by the owner of a shopping center seeking

an injunction restraining defendant union from picketing on a sidewalk in front of a tenant's store in the center, stated: "The issue is whether the respondent, because it has designed its private property for use as a shopping center, has lost its right to ban otherwise lawful picketing. If the record before us clearly established that the property involved is a multi-store shopping center, with sidewalks simulated so as to appear to be public in nature, we would have no difficulty in reaching a conclusion that the property rights of the shopping center owner must yield to the rights of freedom of speech and communication which attend peaceful picketing. See Freeman v. Retail Clerks Union Local No. 1207, supra, (concurring opinion). See also, Notes, 1960 Duke L.J. 310; Note 73, Harv. L. Rev. 1216, and Note 10, Stanford L. Rev. 694. Compare, Marsh v. Alabama (1946), 326 U.S. 501, 66 S. Ct. 276, 90 L. Ed. 265, in which the United States Supreme Court held that the freedom of religion guaranteed by the First and Fourteenth Amendments prevented the enforcement of a criminal trespass statute against a person distributing religious pamphlets on the sidewalk of a company-owned town. See also, National Labor Relations Board v. Babcock & Wilcox Co. (1956), 351 U. S. 105, 76 S. Ct. 679, 100 L. Ed. 975, a decision under the National Labor Management Relations Act involving the right of labor union representatives to circulate literature in an employer's private parking lot. The rationale of the United States Supreme Court in the Babcock & Wilcox Case was used to help resolve a constitutional free speech issue in Nahas v. Local 905, Retail Clerks Ass'n, supra [144 Cal. App. 2d 808, 301 P. 2d 932, rehearing denied 144 Cal. App. 2d 820, 302 P. 2d 829].

"In weighing the parties' conflicting interests of private property and free speech, we would want to

know the physical characteristics of the shopping center so that our decision on this important policy question could be applied with clarity to other disputes which might arise. . . ." 114 N.W. 2d 879-880.

(2) *Freeman v. Retail Clerks Union Local No. 1207,* 363 P. 2d 803 (Wash. 1961) (concurring opinion), wherein a concurring judge observed: "Under ordinary circumstances, the owner of property can control who goes on it and for what purpose; however, a formal dedication to public use is not necessary to greatly limit that control. The legislature has imposed limitations upon the owner's right to exclude persons from his premises or to refuse service to them on account of race or creed, if the premises are used as a place of public resort. In other instances, entirely apart from the legislative action, the courts have placed a limitation on the control that an owner might exercise over his property, as in company towns.

"In this case, it is conceded that legal title to the property, over which the pickets carried their signs, was in the appellants—and not in the public. The issue presented was whether the property owners, despite their precautions and efforts to protect their right to control the use of the property, had lost the right to prevent the pickets from carrying their signs. (I take it that the pickets, sans signs, were just like other members of the public, and entitled to be where they were.)

. . . .

"If instead of being a shopping center, the property in question was merely a forty-acre pasture for contented cows, but a desirable place from which pickets could carry signs imparting information (relative to the non-union status of the employees of J. C. Penney Company) to the customers of that company, there could be no questions that the owner would be entitled to

an injunction—not to restrain the picketing, but to prevent their trespass on property where they had no right to be."

If the union activity involved herein did not amount to a trespass, then there arises the question of federal preemption. I shall avoid a lengthy discussion of that subject, but want to emphasize that the federal decisions stress the high degree of freedom allowed union activity on the property of the employer. While those cases are not controlling authority, they do indicate that the case before us is not as open-and-shut as the majority believe. Many of the federal cases are thoughtfully analyzed in Annot., 100 L. Ed. 984 (1956).

There is another basis for my disagreement with the majority. By restricting picketing to the berm areas at the entrances and exits, the majority have lent their sanction to an activity which has overtones of a secondary boycott. Again, I do not intend to discuss at length the unlawful and harmful effects which can occur to neutral employers by such activity but recommend 10 Stanford L. Rev. 694, 702-706, which considers the evils and possible cures of picketing at shopping center entrances.

Had the majority opinion made reference to the foregoing inescapable conflicts, I might not enjoy the result any more than I now do, but at least I would be satisfied that the majority opinion recognized the problems involved.

I dissent.

Mr. Justice EAGEN joins in this dissenting opinion.