OPINION OF THE COURT
William L. Underwood, Jr., J.
This case is of novel impression and it involves the right of free speech versus the right of privacy. Specifically, can plaintiffs utilize the free speech language of the New York Constitution to compel defendant, the owner of a shopping center, to permit them to distribute leaflets on its private property. The issues presented by this case are of current interest because the leaflets sought to be distributed concern the use of nuclear power.
Defendant moves for summary judgment and plaintiffs also move for the same relief. Both sides admit that the motions present “a pure question of law”.
FACTS
The facts are not in dispute and are stated at length as follows.
Plaintiff, SHAD Alliance (Sound-Hudson Against Atomic Development — SHAD), is a coalition of groups from Long Island, New York City, Westchester and the Mid-Hudson region of New York State. The amended complaint states that “SHAD opposes nuclear power. Members *842 of SHAD seek to stop existing nuclear power plants and prevent the completion of new ones” through education and nonviolent action. Plaintiff, Paumanok People’s Organization (Paumanok), an undefined entity, is, in the language of the amended complaint, “opposed to the use of nuclear power for the generation of electricity and the manufacture and use of nuclear weaponry”. Paumanok “favors the use of safe, renewable and decentralized services of energy. To obtain these goals, Paumanok uses nonviolent direct action and the education of all people to the dangers of nuclear power and weaponry.”
On two occasions, July 5, 1980, and August 16, 1980, representatives of SHAD and Paumanok went to the Smith Haven Mall (Mall). On each occasion, three people, including plaintiff Hank Glaser (plaintiff Carol Cina was present only on August 16, 1980) stood under the portico at the main entrance to the Mall and distributed leaflets which stated that they opposed the use of nuclear power. The leaflets also advised Suffolk County residents of future protest activities against the Shoreham Nuclear Power Station. On each occasion, plaintiffs were prevented from distributing the leaflets by a representative of the Mall pursuant to the Mall policy which prohibits the distribution of leaflets without the permission of the Mall manager. Plaintiffs sought that permission and were refused. Plaintiffs did not block the entrances or exits of the Mall or disrupt the Mall’s operation in any way on either occasion.
In order for the reader to be informed of the place where plaintiffs sought to distribute their leaflets and to relate the private property to various shopping centers mentioned in court cases, a detailed description of the Smith Haven Mall is required.
The Mall is a shopping center located in Suffolk County, New York. The Prudential Insurance Company of America (Prudential), a mutual insurance company, is the owner in fee of the Mall. The Mall property occupies approximately 97 acres, of which 85 acres are devoted to parking for 7,000 automobiles. The Mall building itself occupies about 1.4 million square feet and encloses three department stores together with approximately 125 other stores, restaurants, entertainment and service businesses which are connected *843 by four common, climate-controlled pedestrian walkways laid out in a cross pattern along the north-south and east-west axes. These commercial establishments pay rent for the space at the Mall. The Mall is operated for Prudential by a privately owned management company. The Mall is private property and operated for the commercial benefit of Prudential and its tenants.
The Mall provides a complete array of retail sales including three large “anchor” stores (Macy’s, Sears, Abraham & Straus). The Mall also contains several restaurants (one offering live music), hairstylists, a phone center store, a travel agency, and several banks. Entertainment facilities include a movie theatre, a health spa, and a video arcade and personal services include a dental clinic, an employment service, and a social services agency offering counseling, housing assistance and youth services. It is protected by a private police force and by the county police.
The Mall is the largest retail center in Suffolk County. In 1977, it had $180 million in annual gross sales, which is almost 5% of all retail sales in Suffolk County and it draws customers from over 60 surrounding areas. Almost half of the Mali’s customers visit the Mall at least once a week and almost half shop exclusively at the Mall.
The Mall, like most suburban shopping malls, is designed to encourage people from the community to linger, browse, and congregate in the public areas. The central rotunda of the Mall is its focal point and it is designed for seating a large crowd. It provides numerous areas to sit around the shallow, sunken amphitheatre and it also provides take-out food nearby to encourage patrons to sit and relax. It is probably the center of the heaviest pedestrian flow in Suffolk County. There are also three secondary intersections at the ends of the three corridors leading to the Mall’s “anchor” stores which are designed to provide similar opportunities to sit, linger, relax, and socialize.
The Mall 'is designed to and does provide numerous opportunities for public gatherings and events. There are over 80 promotional events each year, some involving over 70 different exhibits. The Mall plays host to the Boy Scouts *844 and Girl Scouts, runs charity auctions, permits recruitment by local universities and the United States Army, and provides free health services such as blood pressure and hearing tests. The Mall also encourages political or quasi-political events such as voter registration by the League of Women Voters, promotional activities by local towns, and provides space for the local congressman’s mobile office.
Finally, although defendant does not allow any pamphleting, political rallies or functions at the Mall (indeed they point out that they even removed James Buckley from the Mall when he was campaigning for United States Senator in this State), they do permit the Mall to be used for public purposes and exhibits as previously mentioned.
LAW
I
The United States Supreme Court has held that the First Amendment does not permit the distribution of leaflets at a privately owned shopping center.
In Hudgens v NLRB (424 US 507), the Supreme Court held that the Federal Constitution does not guarantee the right to distribute handbills by labor union members on the property of a privately owned shopping center. The court stated (Lloyd Corp. v Tanner, 407 US 551, 569) that property does not “lose its private character merely because the public is generally invited to use it for designated purposes” and that “[t]he essentially private character of a store and its privately owned abutting property does not change by virtue of being large or clustered with other stores in a modern shopping center.”
In an earlier decision, Lloyd Corp. v Tanner (407 US 551, supra), the Supreme Court, in a case remarkably similar to the one at bar, discussed the issues now facing this court as follows (pp 567-570):
“The basic issue in this case is whether respondents, in the exercise of asserted First Amendment rights, may distribute handbills on Lloyd’s private property contrary to its wishes and contrary to a policy enforced against all handbilling. In addressing this issue, it must be remembered that the First and Fourteenth Amendments safe *845 guard the rights of free speech and assembly by limitations on state action, not on action by the owner of private property used nondiscriminatorily for private purposes only * * *
“Respondents contend * * * that the property of a large shopping center is ‘open to the public,’ serves the same purposes as a ‘business district’ of a municipality, and therefore has been dedicated to certain types of public use. The argument is that such a center has sidewalks, streets, and parking areas which are functionally similar to facilities customarily provided by municipalities. It is then asserted that all members of the public, whether invited as customers or not, have the same right of free speech as they would have * * * in the streets of a city or town * * *
“The argument reaches too far. The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use * * *
“We hold that there has been no such dedication of Lloyd’s privately owned and operated shopping center to public use as to entitle respondents to exercise therein the asserted First Amendment rights”.
In view of the Supreme Court decisions in Hudgens and Lloyd, that a privately owned and operated shopping center open to the public does not lose its private character and the First Amendment does not permit the distribution of handbills, can the New York Constitution afford a greater right of freedom of expression?
ii
In PruneYard Shopping Center v Robins (447 US 74, 81), the Supreme Court clearly stated “[o]ur reasoning in Lloyd, however, does not ex proprio vigore [by its own force] limit the authority of the State to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution.”
Indeed, the Court of Appeals has seized upon this principle and stated “on innumerable occasions this court has given our State Constitution an independent construction, affording the rights and liberties of the citizens of this *846 State even more protection than may be secured under the United States Constitution” (Sharrock v Dell-Buick Cadillac, 45 NY2d 152, 159).
In somewhat different language the court remarked, “[w]e have not hesitated when we concluded that the Federal Constitution as interpreted by the Supreme Court fell short of adequate protection for our citizens to rely upon the principle that the document defines the minimum level of individual rights and leaves the States free to provide greater rights for its citizens through its Constitution, statutes or rule-making authority” (Cooper v Morin, 49 NY2d 69, 79; see, also, People v Perri, 72 AD2d 106, 112).
in
We now turn to the language of the New York State Constitution relied upon by plaintiffs.
Section 8 of article I states in pertinent part: “Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.”
Section 9 of article I states, in part, “[n]o law shall be passed abridging the rights of the people peaceably to assemble and to petition the government, or any department thereof”. Finally, section 11 states, in relevant part, “[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof”.
Very recently, the Court of Appeals stated “[t]he protection afforded by the State constitutional right of free expression (NY Const, art I, § 8) is as broad as that provided by the First Amendment and, as the Supreme Court has noted, may in fact provide greater protection (PruneYard Shopping Center v Robins, 447 US 74)” (People v Ferber, 57 NY2d 256, 259; see, also, Bellanca v New York State Liq. Auth., 54 NY2d 228, cert den 456 US 1006; People v Adams, 53 NY2d 241; People v Elwell, 50 NY2d 231; People v Isaacson, 44 NY2d 511).
IV
In fact, five States have interpreted their own Constitutions to permit the distribution of leaflets at a large shop *847 ping center (Robins v PruneYard Shopping Center, 23 Cal 2d 899, affd 447 US 74, supra; State v Schmid, 84 NJ 535; Alderwood Assoc. v Washington Environmental Council, 96 Wn 2d 230; Commonwealth v Tate, 495 Pa 158; Cologne v Westfarms Assoc., 37 Conn 90) and only one State has reached a contrary result (State v Felmet, 302 NC 173).
And, the courts in Connecticut, New Jersey and Washington, as previously noted, have already permitted the distribution of leaflets at large shopping centers and their Constitutions contain almost identical language as that of the New York Constitution.
However, in two cases which can be distinguished from the instant cáse, the Court of Appeals limited the right to distribute literature on private property.
In Watchtower Bible & Tract Soc. v Metropolitan Life Ins. Co. (297 NY 339, 342, cert den 335 US 886), the ministers of Jehovah’s Witnesses sought to distribute their literature door-to-door in “a residential community called Parkchester, which is said to be the largest of its kind in the world”. The court held that a regulation prohibiting the entry into any apartment building for the purpose of canvassing, peddling, soliciting contributions or distributing literature except upon written consent or invitation of a tenant did not violate the free speech provisions of the State or Federal Constitutions. It continued (p 346) that the regulation “does not infringe any of appellants’ [Jehovah’s Witnesses] rights to the free exercise of their religion since it merely regulates their entry onto private property”.
The court stated in effect that the Parkchester apartment houses are private property and that they took on none of the characteristics of public or semipublic property. The court limited its holding that all private property is automatically exempt from constitutional prohibitions because it stated “[t]he distribution which this defendant’s regulation inhibits was not on streets, sidewalks or other public or quasi-public places, but inside of, and into, the several floors and inner hallways of multiple dwellings” (supra, at p 348; cf. Marsh v Alabama, 326 US 501; People v Bohnke, 287 NY 154, cert den 316 US 667, reh den 316 US 713).
*848 In People v Bush (39 NY2d 529), the court held that defendants (union members) were not protected by the First Amendment when they picketed on private property in front of a store which sold the products of their employer. The court did, however, comment (pp 533-534) that “[wjhatever may be our own view about the continued applicability of the free speech protections of our own State Constitution * * * we do not need to reach that question under the facts presented to us today”.
v
The large Mall, which was previously described in detail, can be considered to perform the functional equivalent of a town center and the free flow and dissemination of all ideas would be severely curtailed if plaintiffs were denied access to it. The Mall is thoroughly clothed in the attributes of public or quasi-public property and it may not prohibit persons who wish to disseminate communications by the use of peaceful nonviolent lawful methods. The Mall encourages people from the community to linger, browse and congregate in its public areas and it is designed to and does provide numerous opportunities for public gatherings and events (see Justice Powell’s concurrence in PruneYard Shopping Center v Robins, 447 US 74, 96, supra).
The intrusion by plaintiffs on the right to privacy of the Mall and its tenants is minimal compared to plaintiffs’ right to free speech. And a State, in the exercise of its police power, may adopt reasonable restrictions on private property so long as the restrictions do not amount to a taking without just compensation or contravene any other Federal constitutional provision. .
However, in the PruneYard case (supra), the court permitted the shopping center to “restrict expressive activity by adopting time, place, and manner regulations that will minimize any interference with its commercial functions” (447 US 74, 83, supra).
CONCLUSION
Under the circumstances presented, the facts that the Supreme Court has permitted the States to confer greater freedom of expression rights on their citizens, several States have interpreted their Constitutions to afford *849 greater protection of freedom of speech than the First Amendment, and plaintiffs seek to distribute their leaflets at a large shopping center, this court holds that plaintiffs are permitted to communicate their ideas in the Mall subject to reasonable regulations propounded by defendant.
Plaintiffs’ cross motion for summary judgment is granted and defendant’s motion for the same relief is denied.
Settle an order which shall make allowance for the ability of defendant to impose reasonable regulations concerning time, place and manner of the distribution of leaflets that will minimize any interference with the Mall’s commercial functions.