485 A.2d 1

**WESTERN PENNSYLVANIA SOCIALIST WORKERS 1982 CAMPAIGN, Francis Farley, Mark Zola and Linda Nordquist, Appellants**

v.

**CONNECTICUT GENERAL LIFE INSURANCE CO.**

Superior Court of Pennsylvania.

Argued Jan. 26, 1984.

Filed Oct. 26, 1984.

Reargument Denied Jan. 8, 1985.

Petition for Allowance of Appeal Granted June 18, 1985.

494

496

Jon S. Pushinsky, Pittsburgh, for appellants.

Eric A. Schaffer, Pittsburgh, for appellee.

Before WIEAND, TAMILIA and POPOVICH, JJ.

WIEAND, Judge:

Do the members of a politically oriented group have a constitutional right to use a privately owned shopping center to disseminate information and collect signatures on a nominating petition despite a general policy by the owner which precludes use of the premises for any and all political activity? The trial court held that there was no such right and refused injunctive relief. We affirm.

The material facts are not in dispute. In the spring of 1982, the "Western Pennsylvania Socialist Workers 1982 Campaign," a political committee, undertook a massive petitioning drive to obtain 23,407 signatures necessary to place the Socialist Workers Party's gubernatorial candidate, Mark Zola, on the November, 1982 ballot. Linda Nordquist, a registered Socialist Workers Party voter, Francis Farley, chairperson of the campaign committee, and Mark Zola, the candidate, who are appellants herein, sought to disseminate information and collect signatures at the South Hills Village shopping center.

South Hills Village is an enclosed mall owned by Connecticut General Life Insurance Company in the South Hills area of Allegheny County. Appellants chose South Hills Village because of the large number of persons who go there to shop and to take advantage of public service or entertainment programs periodically provided at the mall. The mall has seven public entrances and houses 126 retail businesses, with exterior parking facilities for approximately 5,000 vehicles. The owner of the mall has a long-standing, nondiscriminatory policy which bans all forms of politically oriented activity on its property, without regard to the nature of the activity or party affiliation of the would-be users.

Appellants sought, and were denied, permission to collect signatures and disseminate information in the mall. Aware of the owner's policy, appellants elected not to expose themselves to arrest for ignoring it. Instead, they filed a complaint in equity on May 11, 1982 seeking an order which would enjoin the owner from enforcing its ban and allow

appellants access to South Hills Village for their political activities. After a hearing before the Honorable Nicholas Papadakos, now a justice of the Pennsylvania Supreme Court, an adjudication and decree nisi were entered denying the requested relief. Exceptions were denied by a court en banc, and a final decree was entered on October 21, 1982. This appeal followed.

■■■ Before we can proceed to a determination of the merits, it is first necessary to discuss the issue of mootness, inasmuch as the relief sought in the trial court—an order enforcing the alleged right to solicit signatures for the 1982 gubernatorial campaign—can no longer be granted. We agree with appellant that although the issue is technically moot at this point in time, the case is properly subject to appellate review. As the Pennsylvania Supreme Court has recognized, "[a] case that is technically moot may be decided on its merits if it involves a question that is capable of repetition but likely to evade review if the normal rules on mootness are applied. *Wiest v. Mt. Lebanon S. Dist.,* 457 Pa. 166, 320 A.2d 362 (1974), cert. denied, 419 U.S. 967, 95 S.Ct. 231, 42 L.Ed.2d 183 (1974); *Stottlemyer v. Stottlemyer,* 458 Pa. 503, 329 A.2d 892 (1974)." *Commonwealth v. Joint Bargaining Committee,* 484 Pa. 175, 179, 398 A.2d 1001, 1003 (1979). See: *Scherrer v. Lamb,* 319 Pa.Super. 290, 466 A.2d 163 (1983); *Commonwealth v. Buehl,* 316 Pa.Super. 215, 462 A.2d 1316 (1983). The issues involved in the instant case are such that they are likely to reoccur and equally as likely to evade review. Therefore, we address the merits of appellants' contentions.

■■■ The free speech provision of the First Amendment of the United States Constitution, applicable to the states by way of the Fourteenth Amendment, does not prevent a privately owned and operated shopping center from enforcing nondiscriminatory and nonarbitrary bans on certain forms of activity on its premises. The right of free speech secured by the federal Bill of Rights is held against the government and cannot be unreasonably infringed. In the absence of "state action," however, the acts of purely

private actors, such as privately owned shopping centers, do not violate the federal constitution; such enterprises are free to enforce policies banning certain forms of speech activities under federal doctrine. *Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976);[1] *Lloyd Corp. v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972).

Recognizing these dispositive Supreme Court decisions, appellants have not argued that they have a federally protected right to exercise free speech at South Hills Village. Instead, they argue that the owner's policy violates rights conferred by the Declaration of Rights contained in the Pennsylvania Constitution, Pa. Const. Art. 1. Specifically, appellants contend that appellee's policy violates their right to alter, reform or abolish their government under Article 1, section 2; their rights of petition and assembly under Article 1, section 20; and their right to speak freely under Article 1, section 7. Their principal argument is premised upon the free speech provisions of section 7. Our discussion will also focus upon that provision because the parties have placed very little emphasis on the separate roles of sections 2 and 20, and because our interpretation of section 7 is controlling also of any interpretation of sections 2 and 20.

■ A state court, in interpreting the provisions of its state constitution, is free to read such provisions more expansively than correlative federal provisions and as conferring greater rights than those established under federal doctrine. *Mesquite v. Alladin's Castle, Inc.*, 455 U.S. 283, 293, 102 S.Ct. 1070, 1077, 71 L.Ed.2d 152, 162 (1982). *Commonwealth v. Sell*, 504 Pa. 46, 470 A.2d 457, 466–467 (1983); *Commonwealth v. Beauford*, 327 Pa.Super. 199, 475 A.2d 783, 788 (1984); *Commonwealth v. Corley*, 316 Pa.Super.

1. In *Amalgamated Food Employees Union, Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), the Court reversed a decision by the Pennsylvania Supreme Court, 425 Pa. 382, 227 A.2d 874 (1967), in which the Pennsylvania Court had ruled that a shopping plaza was not a quasi-public entity and thus could ban picketing without violating the First Amendment. In *Hudgens v. NLRB, supra,* the Supreme Court expressly overruled its prior decision in *Logan Valley*.

327, 335 & n. 12, 462 A.2d 1374, 1378 & n. 12 (1983). See: *Kroger Co. v. O'Hara Township*, 481 Pa. 101, 392 A.2d 266 (1978); *Commonwealth v. Triplett*, 462 Pa. 244, 341 A.2d 62 (1975); *Commonwealth v. Ferguson*, 327 Pa.Super. 305, 475 A.2d 810 (1984); Note, *The Interpretation of State Constitutional Rights*, 95 Harv.L.Rev. 1324 (1982). Thus, the Supreme Court of the United States held that although there was no *federal* basis for a right of access to a private shopping center for politically oriented activities, the state courts of California were free to interpret the *state* constitution's free speech provisions as guaranteeing such access. *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), *affirming* 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d 341 (1979). See: Note, 95 Harv.L.Rev., *supra* at 1401–1408; Note, *Granting Access to Private Shopping Center Property for Free Speech Purposes*, 64 Marq.L.Rev. 507 (1981).

█ The applicability of state constitutional guarantees to shopping centers has been addressed by the courts of sister states. The results have not been uniform. Several jurisdictions have concluded, consistently with the United States Supreme Court, that state constitutional guarantees of free speech and petition do not confer upon individuals the right to exercise such rights at or upon privately owned shopping centers against the wishes of the owner. See: *Cologne v. Westfarms Associates*, 192 Conn. 48, 469 A.2d 1201 (1984) (3–2 decision); *Woodland v. Michigan Citizens Lobby*, 128 Mich.App. 649, 341 N.W.2d 174 (1983) (2–1 decision); *State v. Felmet*, 302 N.C. 173, 273 S.E.2d 708 (1981) (unanimous decision). Cf. *Lenrich Associates v. Heyda*, 264 Or. 122, 504 P.2d 112 (1972). An almost equal number of jurisdictions has held that state constitutional provisions do guarantee some form of access to privately owned shopping centers. See: *Batchelder v. Allied Stores International, Inc.*, 388 Mass. 83, 445 N.E.2d 590 (1983) (4–3 decision); *Alderwood Associates v. Washington Environmental Council*, 96 Wash.2d 230, 635 P.2d 108 (1981) (4 justices announcing judgment of court, one justice concurring, and 4

justices dissenting); *Robins v. Pruneyard Shopping Center*, 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d 341 (1979) (4–3 decision); *Shad Alliance v. Smith Haven Mall*, 118 Misc.2d 841, 462 N.Y.S.2d 344 (1983) (trial court decision). We hold, after careful review of the content and history of Article I of the Pennsylvania Constitution, that privately owned shopping centers may constitutionally ban political activity.

■ Article I, section 7 of the Pennsylvania Constitution provides, in pertinent part, as follows:

> The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.

This provision limits the power of the state to restrict an individual's freedom of expression. However, it is not a self-executing, affirmative declaration that individuals may exercise the right of free speech wherever they choose and in derogation of the rights of private property owners. Cf. *Pendrell v. Chatham College*, 386 F.Supp. 341, 344 (W.D. Pa.1974). If, as appellants contend, the requirement of state action is less stringent when interpreting the provisions of the Pennsylvania Constitution, as opposed to the Federal Constitution, it is nevertheless clear that the provisions of Article I, section 7 do not reach the acts of *purely* private actors.

■ In general, Article I of the Pennsylvania Constitution speaks to an individual's rights vis-a-vis the government's authority to restrict those rights. With respect to this Article, the Supreme Court of Pennsylvania has said: " 'A Constitution is primarily a declaration of principles of the fundamental law. Its provisions are usually only commands to the legislature to enact laws to carry out the purposes of the framers of the Constitution, or mere restrictions upon the power of the legislature to pass laws....' " *Commonwealth v. National Gettysburg Battlefield Tower, Inc.*, 454 Pa. 193, 198, 311 A.2d 588, 591 (1973), quoting *O'Neill v. White*, 343 Pa. 96, 99, 22 A.2d 25, 26 (1941)

(citation omitted). See: *Murphy v. Harleysville Mutual Insurance Co.*, 282 Pa.Super. 244, 257–258 & n. 15, 422 A.2d 1097, 1104 & n. 15 (1980), *cert. denied*, 454 U.S. 896, 102 S.Ct. 395, 70 L.Ed.2d 211 (1981). Accord: L. Tribe, *American Constitutional Law* 1147 n. 1 (1978). See: J. Cooley, *A Treatise on the Constitutional Limitations* 36–37 (rev. ed. 1972).

Section 25 of Article I holds:

> To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of the government and shall remain forever inviolate.

In the *Gettysburg Tower* case, our Supreme Court said of this section the following:

> [I]t should be noted that Article 1 is entitled "Declaration of Rights" and all of the first twenty-six sections of Article 1 which state those specific rights, must be read as limiting the powers of government to interfere with the rights provided therein.
>
> Section 25 of Article 1 should be read as summarizing the philosophy of the first twenty-four sections of Article 1, particularly when it declares that: "... everything in this article is *excepted out of the general powers of the government* and shall forever remain inviolate."

*Id.*, 454 Pa. at 200, 311 A.2d at 592 (emphasis in original) (environmental protection amendment to Constitution—Article 1, section 27—held not self-executing and unable to support action by Commonwealth against private landowners in the absence of an enabling statute).

Most of the 28 sections of the Article I Declaration of Rights are specifically concerned with matters exclusively governmental and thus determinative of whether there has been "state action." Where this is not clear, the courts of this Commonwealth have been hesitant about applying the several sections of Article I to private actors. For example, the 1971 Equal Rights Amendment, contained in section 28, has been held inapplicable to gender-based discrimination by private actors. *Murphy v. Harleysville Mutual Insurance*

*Co., supra,* 282 Pa.Superior Ct. at 257, 422 A.2d at 1104. Similarly, the search and seizure provisions of Article 1, section 8, have been held inapplicable to the conduct of private parties. *Commonwealth v. Dingfelt,* 227 Pa.Super. 380, 382, 323 A.2d 145, 146 (1974); *Simpson v. Commonwealth, Unemployment Compensation Board of Review,* 69 Pa.Cmwlth. 120, 128, 450 A.2d 305, 309 (1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 88, 78 L.Ed.2d 97 (1983).

 It is helpful to examine the background of Article 1, section 7 and the reasons for its adoption. See: *Berardocco v. Colden,* 469 Pa. 452, 458–459, 366 A.2d 574, 577 (1976). In colonial Pennsylvania, the colonists were not at liberty to speak and write freely on governmental matters. Censorship, in the form of prior restraint as well as punishment, was the rule before adoption of the Constitution. See generally: *William Goldman Theatres, Inc. v. Dana,* 405 Pa. 83, 173 A.2d 59, *cert. denied,* 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961); J. White, *supra* at 82–83. Cf. *Willing v. Mazzocone,* 482 Pa. 377, 393 A.2d 1155 (1978) (plurality opinion). Article 1, section 7 was adopted as a means by which to restrict the government's right of intrusion upon an individual's right of free speech. "[W]hat it was designed to do was to prohibit the imposition of prior restraints upon the communication of thoughts and opinions, leaving the utterer liable only for an abuse of the privilege." *William Goldman Theatres, Inc. v. Dana, supra,* 405 Pa. at 88, 173 A.2d at 62. There is no historical basis for concluding that the framers of the Constitution intended to reach the owners of purely private property when they adopted the original free speech provisions of the Constitution.[2]

This view finds support in the Pennsylvania decisions. In *Brush v. Pennsylvania State University,* 489 Pa. 243, 414 A.2d 48 (1980), the Supreme Court reviewed claims that

**2.** The original free speech provisions of the Pennsylvania Constitution were adopted in 1776, some ten years before the adoption of the first amendment to the United States Constitution. For a history of the free expression provisions in early Pennsylvania history, see T. White, *Commentaries on the Constitution of Pennsylvania* 81–86 (1907).

Penn State's regulations which barred canvassing in certain dormitories violated *both* state and federal rights of free expression. Penn State argued, unsuccessfully, that regulation of the dormitories did not constitute "state action," and that, as a consequence, rights of free speech were not violated by university regulations pertaining thereto. The Court rejected this argument because there was a nexus between the Commonwealth and Penn State sufficient to sustain a finding of "state action." *Id.*, 489 Pa. at 249–250, 414 A.2d at 52. Although the Court rested its decision on federal constitutional grounds, the decision is instructive for our purposes because the Court cited Article 1, section 7 of the Pennsylvania Constitution and the federal right of free speech, implicitly suggesting that *both* constitutional provisions required a finding of at least some form of "state action." See generally: *Logan Valley Plaza, Inc. v. Amalgamated Food Employees Union, Local 590*, 425 Pa. 382, 227 A.2d 874 (1967), *rev'd*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), *overruled, Hudgens v. NLRB, supra.*

Appellants rely heavily upon the 1981 Supreme Court decision in *Commonwealth v. Tate*, 495 Pa. 158, 432 A.2d 1382 (1981). In *Tate*, the Court overturned convictions for defiant trespass [3] stemming from the defendants' refusal to desist from distributing politically oriented materials in a peaceful manner while on the campus of Muhlenberg College, a privately owned institution of higher learning in Allentown. The college was being used at the time as the site for a symposium on criminal justice, open to the public for a nominal registration fee of $4. Among the speakers scheduled to appear was William Kelly, then Director of the Federal Bureau of Investigation. Defendants, political activists who opposed Kelly's views, sought to disseminate literature on college property immediately outside the student union building where the symposium was taking place. They had previously sought, but had been denied, permission to distribute these materials on campus. When they persisted in their attempts to distribute leaflets on the

3. 18 Pa.C.S. § 3503.

college campus, they were arrested and later convicted of defiant trespass. The Supreme Court reversed the convictions.

In *Tate*, the defendants' alleged rights of free expression under the state constitution collided with the college's right to possess and regulate its property as it saw fit. The focal point of the controversy was the affirmative defense provided by the legislature to the charge of defiant trespass in 18 Pa.C.S. § 3503(c)(2) as follows:

> (c) Defenses.—It is a defense to prosecution under this section that:
>
> . . . . .
>
> (2) the premises were at the time open to the public and the actor complied with all lawful conditions imposed on access to or remaining in the premises.

The Court ruled that the college had generally opened its campus to the public, that a standardless permit requirement was an unlawful condition to entry, and that, therefore, the appellants were protected by the affirmative defense defined in the statute.

The Court suggested that the college had been a "public forum" and thus a quasi-state actor. The Court appears to have placed the college on a continuum somewhere between the extremes of a state actor, on the one hand, and a purely private actor, on the other. It then found the college closer to the former than the latter. Thus the Court found that the college was a "community center for Allentown," maintaining within a few hundred yards of defendants' arrest a United States Post Office station, a public cafeteria, an information and ticket sales booth for public events, and a federal book depository library required to be open to the public. *Id.*, 495 Pa. at 167, 432 A.2d at 1386. The Court was also concerned that the defendants should have the right to speak freely on the very subject being discussed publicly at the symposium in an area generally accessible to the public. Having invited Mr. Kelly to speak and express his views in a "public forum," the college could not *arbitrarily* deny the defendants an opportunity to express

themselves freely on the same subject. *Id.*, 495 Pa. at 168, 432 A.2d at 1380. By its invitation to Kelly and to the public, the college had created an atmosphere ripe for political debate; and the arbitrary denial of access thereto was held improper. Thus, in balancing the right of the college to possess and protect its property against the defendants' freedom of expression in view of the particular activity being conducted at that particular time by the college, the Court determined that the right of expression should prevail. Similarly, in *State v. Schmid*, 84 N.J. 535, 423 A.2d 615 (1980), *appeal dismissed sub nom. Princeton University v. Schmid*, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982), it was held that Princeton University, a private institution, could not, in view of state constitutional guarantees, arbitrarily deny political activists permission to disseminate information peacefully in a reasonable manner where the University had a policy of encouraging public political debate on its property.

Where, then, does a privately owned shopping center, admittedly not an arm of the state, belong in this continuum? Is it so related to the state as to be a quasi-state entity?

There are three instances in which a supposedly "private" actor has been held subject to federal constitutional restraints. The tests, adopted by the federal courts, although not binding upon us, are nevertheless helpful and, it may be added, consistent with Pennsylvania law. They have been discussed at length in recent federal decisions and hold that federal constitutional restraints will be applied where there is a "symbiotic relationship" between a private actor and the government; where there is a sufficient "nexus" between the actor and the government; and where the actor has assumed a "public function" so as to occupy the position of an arm of the state for constitutional purposes. *Community Medical Center v. Emergency Medical Services of Northeastern Pennsylvania, Inc.*, 712 F.2d 878 (3rd Cir.1983); *Miller v. Indiana Hospital*, 562 F.Supp. 1259 (W.D.Pa.1983). See: *Blum v. Yaretsky*, 457 U.S. 991, 102

S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Brush v. Pennsylvania State University, supra.*

There is no dispute, and appellants do not contend otherwise, that there is neither a symbiotic relationship nor a nexus between South Hills Village and state government. Appellants argue, however, that South Hills Village, by inviting the public to enter its shopping mall, has thrust itself into the position of a state actor by assuming a "public function." Appellants contend that South Hills Village and similar shopping centers have replaced the traditional municipal or downtown shopping area where free speech historically has been protected. They argue that this requires shopping centers to be treated as though they were public property for state constitutional free speech and petitioning purposes.

■■■■■ We cannot in common sense and good reason extend constitutionally protected free speech to privately owned stores and shopping centers merely because the public is invited to enter for purposes of doing business. Indeed, the Pennsylvania Supreme Court has already decided that private shopping centers are not quasi-public entities. *Logan Valley Plaza, Inc. v. Amalgamated Food Employees Union, Local 590, supra,* 425 Pa. at 387–388, 227 A.2d at 877–888. Although reversed by the Supreme Court of the United States on First Amendment grounds, the state court's holding that privately owned shopping centers are not quasi-public entities remains a viable rule for purposes of interpreting the Pennsylvania Constitution. Indeed, the United States Supreme Court's application of First Amendment rights to privately owned shopping centers was later overruled in *Hudgens v. NLRB, supra.* Thus, the precedential value of the Pennsylvania Supreme Court's decision in *Logan Valley,* even under federal standards, remains unimpaired.

The decision in *Commonwealth v. Tate, supra,* does not support a different conclusion. That decision was limited to a situation in which an educational institution had held itself out to the public as a community resource and cultural center, had allowed members of the public to enter its campus, and had permitted community use of its facilities as a public forum for a public official of national prominence. *Commonwealth v. Tate, supra,* 495 Pa. at 174, 432 A.2d at 1390. South Hills Village lacks any of these essential trappings of a public forum.

Merely inviting the public for purposes of engaging in commerce does not convert a privately owned shopping center into a public or quasi-public forum. *Lloyd Corp. v. Tanner, supra* at 564–565, 92 S.Ct. at 2227, 33 L.Ed.2d at 200–201. See: *Cologne v. Westfarms Associates, supra* at ——, 469 A.2d at 1210; *Woodland v. Michigan Citizens Lobby, supra* at 176; *State v. Felmet, supra* at 177, 273 S.E.2d at 712; *Lenrich Associates v. Heyda, supra* at 124, 504 P.2d at 114. See also: *Brush v. Pennsylvania State University, supra,* 489 Pa. at 251 n. 6, 414 A.2d at 52 n. 6. The owner's policy banning all political activity without discrimination was determined to be necessary to maintain an atmosphere conducive to the successful conduct of its commercial enterprise. Appellants, on the other hand, have contended that their state constitutional rights of free expression, petition and assembly should be balanced against less significant property interests of appellee, as was done in *Commonwealth v. Tate, supra,* and in cases from other jurisdictions. Unlike the situation in *Tate,* however, there is no basis for balancing the parties' respective rights in this case. Without at least a quasi-public entity, we are not free to rewrite the constitution and impose upon the owner of this shopping center judicial restraints regarding the manner in which it does business.

For the court to assume such a regulatory function ... would relegate the legislature to a subordinate role in our governmental scheme. Statutes would become largely obsolete if courts in every instance of the assertion of

conflicting constitutional rights should presume to carve out in the immutable form of constitutional adjudication the precise configuration needed to reconcile the conflict. If, as the plaintiffs contend, the development of large suburban shopping centers has greatly diminished opportunities for political advocacy in the public streets of downtown areas and other public places, the problem should be presented to the legislature. We cannot presume that that body has any less concern for political liberty than this court.

*Cologne v. Westfarms Associates, supra* at ——, 469 A.2d at 1210.

■ Finally, it is readily apparent that a constitutional balancing of interests would weigh heavily in favor of the owner's right to impose a uniform, nondiscriminatory ban on political activity in its enclosed shopping center. The nature of the privately owned real estate, the limited nature of its invitation to the public to enter, and the nondiscriminatory scope of its prohibition on political activity must be held to outweigh the interest of the Socialist Workers Committee, or any other politically oriented group, to access and entry for political purposes.

Decree affirmed.