721 F.2d 68
 1983-2 Trade Cases 65,716, 14 Fed. R. Evid. Serv. 1231
 CARDIO-MEDICAL ASSOCIATES, LTD. and Thomas J. McBride, M.D.,
and Paul T. Cass, M.D., and C. Richard Schott,
M.D., and Michael B. Goodkin, M.D., Appellants,
v.
CROZER-CHESTER MEDICAL CENTER and James H. Loucks, M.D., and
Michael C. Boyd, William J. Breece, John F. Crampt, Esq.,
Daniel R. Curran, Mary E. Dale, Conrad A. Etzel, M.D.,
Jeremiah A. Hartley, Joseph R. Layton, Rev. David A.
MacQueen, Peter L. Miller, William B. Mitchell, Jr.,
Clarence R. Moll, Ph.D., J. Harold Perrine, Malcolm B.
Petrikin, Esq., and Bertram M. Speare individually and as
members of the Crozer-Chester Medical Center Board of
Directors and James Clark, M.D., Chief of Department of
Medicine of Crozer-Chester Medical Center and Daniel J.
Marino, M.D., David R. Mishalove, M.D., Joel A. Krackow,
M.D., Adrian S. Weyn, M.D., Peter Lavine, M.D., Michael Yow,
M.D., and Ancil Jones, M.D., t/a Cardiology Associates of
Delaware County, Appellees.
 No. 82-1817.
 United States Court of Appeals,
Third Circuit.
 Argued July 12, 1983.
Decided Nov. 18, 1983.
 
 David Berger (argued), Merrill G. Davidoff, Allan M. Sandals, Berger & Montague, P.C., Philadelphia, Pa., and Howard Richard, Lyn B. Schoenfeld, Richard, Disanti, Hamilton, Gallagher & Paul, Media, Pa., for appellants.
 H. Robert Halper (argued), Hope S. Foster, John J. Miles, Mary Susan Philp, O'Connor & Hannan, Washington, D.C., John W. Wellman, Steven G. Brown, Petrikin, Wellman, Damico, Carney & Brown, P.C., Media, Pa., for appellees Crozer-Chester Medical Center, et al.
 H. Robert Fiebach, Roberta D. Liebenberg, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellees Cardiology Associates of Delaware County.
 Before SEITZ, Chief Judge and SLOVITER and VAN DUSEN, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Chief Judge:
 
 
 1
 This is an appeal from two orders of the district court striking appellants' demand for a jury trial and dismissing appellants' amended complaint for lack of subject matter jurisdiction.
 
 
 2
 The issues on appeal are two: whether appellants, plaintiffs in an action charging violations of sections 1 and 2 of the Sherman Act, have alleged sufficient effects on interstate commerce to withstand a motion to dismiss for lack of subject matter jurisdiction, and whether appellants are entitled to a jury trial.I. Background
 
 
 3
 Appellants in this case are four physicians and their employer, Cardio-Medical Associates, Ltd. (hereafter referred to as "plaintiffs"). All four physicians practice in Pennsylvania and specialize in cardiology and internal medicine. Cardio-Medical Associates is a Pennsylvania corporation created for the purpose of facilitating the physicians' practice of cardiology and internal medicine.
 
 
 4
 Appellees are the Crozer-Chester Medical Center and various of its employees (hereafter referred to as "defendants"). The Medical Center is a health care facility located in Upland, Pennsylvania. It provides various medical services, including cardiological services. Plaintiffs maintain their offices in one of the buildings in defendants' complex.
 
 
 5
 Plaintiffs filed a complaint against defendants in the district court in 1981, charging violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1, 2, and the equal protection and due process clauses of the fourteenth amendment. Plaintiffs alleged that defendants had entered into contracts and other agreements to prevent the plaintiff doctors from using certain of defendants' specialized cardiological equipment, located in defendants' complex. These agreements, according to plaintiffs, were part of a conspiracy to restrain trade and monopolize the local market for cardiological services. As a result, plaintiffs were allegedly foreclosed from this market and were injured both in their ability to offer full cardiological services to existing patients and in their ability to attract new patients.
 
 
 6
 Defendants answered the complaint and then filed a motion for judgment on the pleadings under Fed.R.Civ.P. 12(c), alleging a failure to state a claim and lack of subject matter jurisdiction. The district court granted this motion. The constitutional claim was dismissed with prejudice, and plaintiffs have not renewed that claim in subsequent proceedings. The Sherman Act claims were dismissed for lack of subject matter jurisdiction. This dismissal was without prejudice, and plaintiffs were given sixty days in which to file an amended complaint. 536 F.Supp. 1065.
 
 
 7
 Plaintiffs filed a timely amended complaint in which they renewed their claims under sections 1 and 2 of the Sherman Act and demanded, for the first time, a jury trial. Without answering this complaint, defendants moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). Defendants also moved to strike plaintiffs' demand for a jury trial and to stay all discovery pending disposition of the Rule 12(b)(1) motion.
 
 
 8
 In separate opinions, the district court granted both the motion to strike the demand for a jury trial, 95 F.R.D. 194, and the motion to dismiss, 552 F.Supp. 1170. Plaintiffs appeal from orders implementing those two decisions.
 
 II. Jurisdiction Under the Sherman Act
 
 9
 Sections 1 and 2 of the Sherman Act both require that the acts prohibited by those sections relate to trade or commerce "among the several States". This requirement of interstate commerce has been construed as an element of both the jurisdictional standard and the substantive offense under the Sherman Act. See Mortensen v. First Federal Savings & Loan Association, 549 F.2d 884, 890-91 (3d Cir.1977). In the present appeal we are concerned only with jurisdiction.
 
 
 10
 There are two ways to satisfy the jurisdictional requirement. The proscribed conduct may itself be "in interstate commerce", or the conduct may be a purely intrastate activity that has a "substantial and adverse effect" (or, what is apparently the same thing, a "not insubstantial effect") on interstate commerce. See, e.g., McLain v. Real Estate Board of New Orleans, 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980) ("not insubstantial effect"); Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 743, 96 S.Ct. 1848, 1852, 48 L.Ed.2d 338 (1976) ("substantially and adversely affects interstate commerce"). In this appeal, plaintiffs argue that they have adequately alleged that defendants' actions had the requisite "effect" on commerce.
 
 
 11
 The first issue that we must consider is the question of the type of effect that must be shown. The district court held that plaintiffs' complaint must satisfy a "tripartite test" by demonstrating the following:
 
 
 12
 (i) the presence of interstate commerce; (ii) the existence of a substantial and adverse effect on interstate commerce; and (iii) the requisite nexus between the challenged activities of defendants and the effect on the relevant channel of interstate commerce.
 
 
 13
 552 F.Supp. at 1177 (emphasis in original). The district court based this test on language in various decisions of the Supreme Court. In our opinion, however, the first and third findings in this analysis are subsumed within the second finding. Cf. McLain, 444 U.S. at 242, 100 S.Ct. at 509; Hospital Building Co., 425 U.S. at 743-44, 96 S.Ct. at 1852. We therefore require only that plaintiffs show a substantial and adverse effect on commerce.
 
 
 14
 This court has elsewhere explained this requirement in the following terms: "[s]ubstantiality of effect ... is to be viewed on a case-by-case, practical economic basis, from the perspective of whether the local activity has a significant impact on competition in commerce and whether the commerce so affected is substantial in volume." Harold Friedman, Inc. v. Thorofare Markets Inc., 587 F.2d 127, 132 (3d Cir.1978).
 
 
 15
 The district court also held that the plaintiffs may not meet their burden merely by demonstrating that the defendants' conduct "shifted" the flow of interstate commerce away from the plaintiffs and toward some other firm. According to the district court, the plaintiffs must demonstrate a net change in the flow of interstate commerce into or out of the state. 552 F.Supp. at 1178. In making such a showing, "the identified aspect of interstate commerce must relate to the activities of the plaintiffs, not the defendants." Id. at 1177. We consider these two holdings in turn.
 
 
 16
 There is no doubt, at least in the Third Circuit, that the requisite effect need not be a reduction in commerce. In Harold Friedman Inc., supra, we held that the effect need not be of any particular magnitude so long as it is substantial, and in fact the requirement may be satisfied "even if interstate commerce is increased by the anticompetitive conduct." 587 F.2d at 132.
 
 
 17
 This does not answer the question, however, whether there must be either an increase or decrease in net trade. This issue has not been addressed directly either by the Supreme Court or by this court. We approached the issue in Harold Friedman, Inc., where we held that the plaintiff had met its burden by showing a decrease in its own trade and an increase in the defendant's trade. We did not consider the result where the decreases and increases were equal and therefore produced only a "shift".
 
 
 18
 The Sixth Circuit has directly addressed this issue and concluded that a mere shift is sufficient to satisfy the requirement of an effect on interstate commerce. In James R. Snyder Co., Inc. v. Associated General Contractors of America, 677 F.2d 1111 (6th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 374, 74 L.Ed.2d 508 (1982), the court looked to the Supreme Court's decisions in McLain and Hospital Building Co. and concluded that the effect of the defendant's conduct on the net flow of interstate commerce was not of any particular significance. 677 F.2d at 1114-15.
 
 
 19
 We agree that the decisions in McLain and Hospital Building Co. do not require any particular type of substantial effect on commerce. In McLain, the Court considered the effects on commerce of an alleged conspiracy by real estate brokers to fix brokerage rates in New Orleans. The Court held that the jurisdictional requirement was satisfied by allegations that the conspiracy affected both the sale of real estate to interstate buyers and the financing of those sales by interstate lenders. 444 U.S. at 245, 100 S.Ct. at 510-11. Although noting that such a conspiracy would probably have an effect on "the frequency and terms of residential sales transactions," id. at 246, 100 S.Ct. at 511, the Court did not appear to require the plaintiff to demonstrate or allege any particular effect on the overall flow of realty-related commerce into the state. Instead, the Court explained that jurisdiction would not be defeated "by plaintiff's failure to quantify the adverse impact of defendant's conduct." Id. at 243, 100 S.Ct. at 510. Cf. Goldfarb v. Virginia State Bar, 421 U.S. 773, 785, 95 S.Ct. 2004, 2012, 44 L.Ed.2d 572 (1975) ("once an effect is shown, no specific magnitude need be proved").
 
 
 20
 In Hospital Building Co., the Court considered the jurisdictional sufficiency of a complaint charging defendants with conspiring to obstruct plaintiff's attempt to build a new hospital in North Carolina. The Court held that the plaintiff's burden was satisfied by allegations that the conspiracy, if successful, would substantially reduce the plaintiff's purchase of out-of-state drugs and supplies and render unnecessary the planned interstate financing for the construction. 425 U.S. at 744, 96 S.Ct. at 1852. The Court expressed no interest in whether the financing and purchases would simply be shifted to some other hospital project.
 
 
 21
 This unwillingness of the Supreme Court to require a plaintiff to quantify the adverse impact of the defendant's conduct on interstate trade makes it difficult to understand how a plaintiff can be required to show a net change in the flow of business into or out of the state. Such a showing would depend on a comparison of quantities lost with quantities gained, and would in effect require the plaintiff to make a showing that Goldfarb refuses to require. We are unwilling to impose such a requirement.
 
 
 22
 There is another reason to draw back from the district court's "shifting" theory. It has been frequently observed that Congress, in enacting the Sherman Act, intended to regulate anticompetitive conduct to the full extent of its power under the Commerce Clause. See, e.g., Hospital Building Co., 425 U.S. at 743 n. 2, 96 S.Ct. at 1852 n. 2; Harold Friedman, Inc., 587 F.2d at 135. There can be no doubt that Congress may, if it wishes, regulate anticompetitive conduct that affects interstate commerce, even if that conduct does not change the net flow of interstate commerce.
 
 
 23
 The district court noted, and defendants repeat in their brief on appeal, that the shifting theory receives support from a recent Supreme Court decision, Exxon Corp. v. Maryland, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). There the Supreme Court considered a challenge under the Commerce Clause to a Maryland statute prohibiting oil refiners from owning and operating retail outlets for their products within the state. The Court rejected the challenge:
 
 
 24
 The source of the consumers' supply may switch from company-operated stations to independent dealers, but interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another.
 
 
 25
 437 U.S. at 127, 98 S.Ct. at 2214.
 
 
 26
 In our opinion, this language is inapposite. There are at least two powers embodied in the Commerce Clause. One is the power of the Commerce Clause that authorizes Congress's own regulation of interstate trade. This aspect was not implicated in the Exxon Corp. decision. The other power is that of the "dormant" clause, which is used by the judiciary to invalidate state regulations interfering with an area of interstate trade that Congress intends, by implication, to leave free. This is the aspect of the Commerce Clause at issue in Exxon Corp. The Court ruled that a state regulation that merely shifts commerce from one enterprise to another cannot be regarded as interfering with an implicit decision by Congress to keep interstate trade free. This does not mean, however, that Congress could not itself affirmatively act to regulate intrastate conduct that has no greater effect on interstate commerce than the Maryland statute has.
 
 
 27
 We are also reluctant to adopt the shifting theory because of our uncertainty about what the theory would require. The district court in this case assumed that there was a shift in trade because the plaintiffs lost business which the defendants acquired. See, e.g., 552 F.Supp. at 1192, 1194. In order to determine whether there is a net change in the volume of interstate commerce, however, it might be necessary to consider other factors or examine other transactions. For example, it might be necessary to consider differences between the different parties' trade practices, such as their sources of supply or the prices they pay. It is also unclear what the relevant time frame would be for assessing the changes. It is not appropriate to burden the jurisdictional inquiry with such complications.
 
 
 28
 Finally, we find ourselves in disagreement with the shifting theory because it reflects a misunderstanding of the role the Commerce Clause plays in the Sherman Act, at least insofar as jurisdiction is concerned. The purpose of the Sherman Act is to protect competition against certain restraints and monopolistic conduct. Anticompetitive conduct may occur locally as well as in interstate commerce. Congress, however, is constrained in its attempt to regulate this conduct by the limits of the Commerce Clause, the source of its authority. It is not relevant to the purpose of regulating anticompetitive conduct that the conduct affect the net volume of interstate trade, nor is it necessary to the exercise of congressional power under the Commerce Clause. What is relevant is the presence in interstate commerce of transactions that, as a result of the anticompetitive conduct, are "substantially" different from the transactions that would otherwise have occurred. These may be differences in the overall number or volume of such transactions, but they may also be differences in the terms of the transactions, or the parties thereto. Such transactions "burden" interstate commerce because they are the result, directly or indirectly, of conduct that violates federal antitrust policy. They are a burden not on the volume of trade, but on the freedom of trade.[1]
 
 
 29
 The district court also held that "the identified aspect of interstate commerce must relate to the activities of plaintiffs, and not defendants." 552 F.Supp. at 1177. Elsewhere in its opinion, the court noted that "[t]he extent of defendants' activities in interstate commerce ... is irrelevant in establishing jurisdiction under the Sherman Act in denial of hospital staff privileges cases." Id. at 1190 n. 22. Although this language seems puzzling, we do not read it literally. Clearly the defendants' conduct is relevant to jurisdiction under the Sherman Act insofar as the requisite effects on commerce must derive either directly or indirectly from that conduct. We understand the district court to be making a different point--not that defendants' conduct is irrelevant, but that it is only relevant insofar as it affects interstate commerce through the person of the plaintiffs. Earlier, the court had held that the only conduct by the defendants relevant to the jurisdictional inquiry was the defendants' allegedly illegal conduct. 552 F.Supp. at 1178 n. 6.[2] Combining these two holdings, we conclude that the court wished to tie the jurisdictional inquiry to the substantive offense by requiring that the same conduct be the basis for both showings.
 
 
 30
 We could rest our holding on plaintiffs' jurisdictional allegations, discussed below, without reviewing the district court's limitation on the scope of the jurisdictional inquiry. We have decided to reach the issue, however, because the district court's theory conflicts with the approach taken by this court in recent decisions and with the approach in other circuits. Although this court has not ruled on the issue directly, it has shown its willingness in several recent cases to consider the defendant's conduct both as it affects interstate commerce through the person of the plaintiff and as it affects commerce directly. See Harold Friedman, Inc., 587 F.2d at 134; J.P. Mascaro & Sons, Inc. v. Wm. J. O'Hara, Inc., 565 F.2d 264, 266 (3d Cir.1977); Mortensen v. First Federal Savings & Loan Association, 549 F.2d 884, 897 (3d Cir.1977). The district court's approach also conflicts directly with a recent decision by the Ninth Circuit, Hahn v. Oregon Physicians Service, 689 F.2d 840, 844 (9th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983). See also Konik v. Champlain Valley Physicians Hospital Medical Center, 561 F.Supp. 700, 710-12 (N.D.N.Y.1983).
 
 
 31
 In our opinion there is no reason why an enterprise engaged in nationwide anticompetitive conduct should not be subject to suit by a local victim simply because the defendant's conduct, as regards that particular plaintiff, does not affect interstate commerce. Moreover, there seems to be no reason why, as a matter of constitutional authority, Congress may not create a cause of action for wholly intrastate plaintiffs as part of a scheme to regulate anticompetitive conduct that otherwise affects interstate commerce. See Maryland v. Wirtz, 392 U.S. 183, 193, 88 S.Ct. 2017, 2022, 20 L.Ed.2d 1020 (1968). We therefore decline to adopt the district court's theory that defendants' conduct is relevant to the jurisdictional inquiry only insofar as it affects interstate commerce through the person of the plaintiff.
 
 
 32
 In sum, this court will review plaintiffs' complaint to determine whether it has alleged a substantial and adverse, or a not insubstantial, effect on interstate commerce. We do not require that plaintiffs allege a net change in the volume of interstate commerce. Finally, we are willing to examine the defendants' conduct both as it affects interstate commerce through the person of the plaintiff and as it affects commerce independently.
 
 III. CMA's Jurisdictional Allegations
 
 33
 We now turn to consider whether plaintiffs have met their burden and established that the district court should take jurisdiction over their claim.
 
 
 34
 By way of introduction, we note that defendants' motion under Rule 12(b)(1) was filed prior to any answer. The motion is therefore a facial challenge to jurisdiction, asserting that plaintiffs' complaint, on its face, does not allege sufficient effects on interstate commerce to warrant the court in taking jurisdiction. As this court has explained elsewhere, and as the district court recognized, the court in assessing a Rule 12(b)(1) motion based on the pleadings must assume that the allegations contained in the complaint are true. Mortensen, 549 F.2d at 891. The Supreme Court has noted that such dismissals "should be granted very sparingly." Hospital Building Co., 425 U.S. at 746, 96 S.Ct. at 1853.
 
 
 35
 Plaintiffs argue that the district court, although declaring its intention to consider defendants' motion according to this rule, nonetheless refused repeatedly to assume the truth of the allegations in the complaint and rebutted the allegations with its own assertions founded on "logic" and common sense. Defendants respond that the district court was simply exercising its right to take judicial notice of adjudicative facts under Fed.R.Evid. 201.
 
 
 36
 Frequently during its analysis of plaintiffs' complaint, the district court rejected the factual allegations contained therein. For example, in considering the allegation that defendants' conduct affected the interstate travel of patients seeking cardiological therapy, the district court asserted that it was "logically inconceivable" that plaintiffs' ability or inability to offer the services in question could have "any discernible impact" on the travel of patients. In choosing a doctor, according to the district court, patients do not consider whether the doctor provides a service "that the patient cannot even pronounce." 552 F.Supp. at 1188. This rejection of plaintiffs' allegation cannot be justified as judicial notice under Rule 201. That rule defines a "judicially noticed fact" as one "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Clearly the district court's assertion is reasonably disputable. It is not "generally known", nor is any source offered for determining its accuracy. In reviewing plaintiffs' complaint, we will therefore assume that the jurisdictional allegations are true.
 
 
 37
 We arrive finally at the heart of this appeal, the jurisdictional allegations set forth in plaintiffs' complaint. We need only consider a few of these allegations to conclude that plaintiffs have satisfied their burden at this stage in the proceedings.
 
 
 38
 First, plaintiffs allege that both they and defendants offer cardiological services to patients living in an area defined by a radius extending eight to ten miles from defendants' complex. This area includes portions of the states of New Jersey and Delaware, in addition to Pennsylvania. Plaintiffs allege that approximately 12-15% of their patients are from out-of-state, and that these patients account for over $100,000 of plaintiffs' annual revenue. On this basis, plaintiffs allege that approximately 12-15% of the additional patients they would have served in the absence of defendants' allegedly anticompetitive conduct would have come from out-of-state, and that the total revenues from these patients would have been in the hundreds of thousands of dollars during the relevant time period.
 
 
 39
 In addition, plaintiffs allege that cardiological services require the use of large amounts of drugs and other medications, and that most of these products are manufactured out-of-state. Defendants' practices have allegedly prevented plaintiffs from prescribing medication for the patients it would have served in the absence of such practices, and have thereby affected the interstate trade in such medication.
 
 
 40
 This brief restatement of plaintiffs' jurisdictional allegations is by no means exhaustive. Plaintiffs allege various other ways in which defendants' conduct has affected interstate commerce. We need proceed no further, however, because we conclude on the basis of the allegations already described that plaintiffs have met their burden at this stage of the proceedings. Interferences with the interstate travel of patients, the interstate payment of fees, and the interstate purchase of medication are well-recognized methods for demonstrating an effect on interstate commerce in antitrust litigation. See, e.g., Hospital Building Co., 425 U.S. at 744, 96 S.Ct. at 1852; Mishler v. St. Anthony's Hospital Systems, 694 F.2d 1225, 1227 (10th Cir.1981); Pontius v. Children's Hospital, 552 F.Supp. 1352, 1361 (W.D.Pa.1982); Pao v. Holy Redeemer Hospital, 547 F.Supp. 484, 490 (E.D.Pa.1982). We therefore conclude that plaintiffs' pleadings meet the jurisdictional requirements of the Sherman Act, and we reverse the district court's holding to the contrary.
 
 IV. CMA's Jury Demand
 
 41
 Because we reverse on the jurisdictional issue, we must consider plaintiffs' argument that they are entitled to a jury trial on remand. Plaintiffs concede in their brief that, with respect to the original complaint, they have waived their right to a jury trial by failing to make a demand within ten days of the final pleadings. Fed.R.Civ.P. 38(d). Plaintiffs contend, however, that the dismissal of the entire original complaint without prejudice requires us to treat that complaint as if it never existed, and to conclude that plaintiffs are entitled to a jury trial on the basis of the "timely" demand contained in its amended complaint. The district court rejected that contention, 95 F.R.D. 194, and so do we.
 
 
 42
 Our decision is based in large part on another decision of this court, Borelli v. City of Reading, 532 F.2d 950 (3d Cir.1976) (per curiam). There we held that a dismissal without prejudice, with leave to amend, is not a final order until either the time for amendment has expired or the plaintiff has announced its intention to stand on the complaint. Until then, the dismissal "is neither final nor appealable because the deficiency may be corrected by the plaintiff without affecting the cause of action." 532 F.2d at 951. In the present case the portion of plaintiffs' complaint asserting claims under the Sherman Act was dismissed without prejudice, with leave to amend the jurisdictional allegations within sixty days. Plaintiffs amended their complaint as suggested and filed it in a timely manner. The amended complaint asserted identical claims under the Sherman Act. It was given the same docket number as the original complaint, and it was assigned to the same district judge. No new filing fees were paid, and no new summons was served on the defendants. There can be no doubt that, in such circumstances, the dismissal order was not final and plaintiffs must remain bound to their waiver of a jury trial on the basis of the original pleadings. The fact that the original complaint was dismissed in its entirety does not distinguish this case from others in which the plaintiff has not been allowed to make a new demand for a jury trial on the basis of amended pleadings. See, e.g., Southern Equipment Co. v. Christensen, 40 F.R.D. 126 (S.D.N.Y.1966); Ridge Theatre Corp. v. United Artists Corp., 27 F.R.D. 8 (E.D.Pa.1961).[3]
 
 
 43
 Plaintiffs allege that this result is inconsistent with a series of cases considering the effect of a dismissal without prejudice on the tolling of a statute of limitations. Again, we reject this contention. It is a well recognized principle that a statute of limitations is not tolled by the filing of a complaint subsequently dismissed without prejudice. As regards the statute of limitations, the original complaint is treated as if it never existed. See Butler v. Sinn, 423 F.2d 1116 (3d Cir.1970) (per curiam); Di Sabatino v. Mertz, 82 F.Supp. 248 (M.D.Pa.1949). The cases that so hold, however, are distinguishable from the instant appeal on precisely the issue that we identify as determinative in this case, namely the finality of the dismissal. Many of the cases we have read involved voluntary dismissals. See, e.g., Goff v. United States, 659 F.2d 560 (5th Cir.1981). A voluntary dismissal is a final order. See LeCompte v. Mr. Chip, Inc., 528 F.2d 601, 603 (5th Cir.1976). Other decisions involved circumstances that make it equally clear the dismissal was final. See, e.g., Gainey v. Brotherhood of Railway and Steamship Clerks, 275 F.Supp. 292 (E.D.Pa.1967) (more than six years between two complaints); Falsetti v. Local Union No. 2026, United Mine Workers, 249 F.Supp. 970 (E.D.Pa.1965) (first suit in state court, second in federal court). Moreover, the rule has not been applied in cases where there was no final order of dismissal. See, e.g., Gordon v. Green, 602 F.2d 743 (5th Cir.1979) (complaint amended under Rule 15). But see Moore v. St. Louis Music Supply Co., 539 F.2d 1191 (8th Cir.1976) (implying that dismissal without prejudice will necessarily bar amended complaint).
 
 V. Conclusion
 
 44
 For the reasons set forth above, we will reverse the district court's order dismissing the amended complaint and will affirm the order striking the jury demand. Costs are awarded in the proportion of seven-eighths to plaintiffs and one-eighth to defendants.
 
 
 
 [1]
 The district court based the shifting theory in part on Moles v. Morton F. Plant Hospital, Inc., 1980-81 Tr.Cas. p 63,600 (M.D.Fla.1978), aff'd mem., 617 F.2d 293 (5th Cir.), cert. denied, 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 147 (1980). We decline to follow that decision
 
 
 [2]
 In view of our holding on CMA's jurisdictional allegations, infra, it is unnecessary for us to consider whether the district court was correct in limiting its inquiry to the defendants' illegal activities. Cf. McLain, 444 U.S. at 242-43, 246, 100 S.Ct. at 509-10, 511
 
 
 [3]
 Plaintiffs have based their argument for a jury trial entirely on Rule 38(b). Plaintiffs have not raised the issue of the availability of a jury trial under Rule 39(b), which gives a court the discretion to grant a jury trial even though proper demand was not made