506 A.2d 1377

**CROZER CHESTER MEDICAL CENTER and Reproductive Health and Counseling Center**

v.

**Thomas MAY, Miriam Andrews, Joan E. Andrews, Robert E. Moran and Mary Ann Moran, Appellants.**

Superior Court of Pennsylvania.

Argued June 4, 1985.

Filed Feb. 18, 1986.

Reargument Denied April 25, 1986.

52

Gerry Woods and Joseph C. Cascarelli, Philadelphia, for appellants.

Donald T. Petrosa, Media, for Crozer, appellee.

Arthur Levy, Media, for Reproductive, appellee.

Before WICKERSHAM, BROSKY and TAMILIA, JJ.

WICKERSHAM, Judge:

This is an appeal by five pro-life appellants who are seeking the reversal of an injunction prohibiting their presence on appellees' private property.

Appellees are Crozer-Chester Medical Center (hereinafter "CCMC") and Reproductive Health and Counseling Center (hereinafter "RHCC"). CCMC is a private, non-profit hospital and medical complex situated on a large plot of land in Upland, Chester, Delaware County. One of CCMC's buildings, located approximately in the center of its 68 acre property, is leased by CCMC to a private corporation known as RHCC. RHCC provides numerous reproductive health services, such as education, gynecological services, pregnancy testing, vasectomies, and first trimester abortions, the last service being the reason behind the instant controversy.[1] RHCC is bordered on three sides by parking areas; on its remaining side, it is bordered by Seminary Avenue, a private road owned exclusively by CCMC. The closest public road is Upland Avenue, which RHCC faces at a distance of approximately 600 feet, and which is the principal means of entrance to and exit from the facilities of CCMC.

Over the last decade, appellants,[2] none of whom are employees, staff, patients, or invited guests of either CCMC or RHCC, individually and/or in concert with the other

1. Some second and third trimester abortions are also performed by CCMC.

2. Appellants include Thomas May, Joan Andrews, Miriam Andrews, Robert Moran, and Mary Ann Moran. The final injunction order also names "and all others acting in concert with them, and all others who may be shown a certified copy of [the order]."

appellants, have been picketing, praying, demonstrating, and passing out pro-life literature along Seminary Avenue (which until August 1977 was a public road) and at its intersection with Upland Avenue. All of these activities have taken place in violation of CCMC's general written hospital policy prohibiting solicitation in or upon its property. In more recent years, the situation has grown steadily worse in that some or all of the appellants have ventured onto the parking lots adjacent to RHCC, physically accosted patients and staff, pointed cameras at patients entering or leaving RHCC and CCMC, and physically blocked the entrance to RHCC. Appellees' requests for appellants either to leave the premises or desist in the above activities were repeatedly met with resistance. Because appellants' actions caused concern among the patients, employees, and staff of appellees and disrupted the smooth and efficient operation of CCMC, CCMC eventually resorted to calling the Upland police to have the various appellants forcibly removed. As a result, each of the appellants has been arrested on at least one or more occasions for his or her refusal to leave the property of appellees.

Sanctions at law having proved ineffective[3] and faced with both escalating protests and appellants' expressed intention to continue their activities at or about the premises of CCMC and RHCC, appellees requested an injunction enjoining the continued and threatened trespasses by appellants on their property and the continued and threatened harassment of appellees' patients, employees, and staff. On March 18, 1982, the Honorable Howard F. Reed, Jr., of

**3.** Appellants' and appellees' involvement with the courts apparently began in 1974, when RHCC was granted an injunction prohibiting appellants from carrying placards with the words "kill," "murderers," and "jail." Of the multiple arrests charging defiant trespass, appellants were variously acquitted or convicted at the district justice level. In those cases appealed to the court of common pleas, all but one resulted in determinations of guilt. Recourse to criminal action has generally proved ineffective, however, because appellants are indigent and cannot be imprisoned for failure to pay fines imposed, and all appellants have continued to picket, some refraining only during their period of probation. Hence, injunctive relief was the only recourse left open to appellees.

the Court of Common Pleas of Delaware County issued a preliminary injunction prohibiting appellants from entering upon appellees' private property and from otherwise interfering with appellees' business of providing health care. At least twelve hearings were held from March 1982 through September 1982, and the court viewed the premises involved. On February 10, 1984, the Honorable Louis A. Bloom entered a Decree Nisi which essentially continued the preliminary injunction entered two years before.[4] Appellants filed 140 exceptions, but following argument before the court *en banc*, their exceptions, many of which were devoted to the morality of abortion, were dismissed and the Decree Nisi was made final on November 9, 1984. Appellants filed this timely appeal.

Appellants, who are represented by several attorneys, raise a number of issues on appeal, many of which overlap.[5]

**4.** It is important to note that the only restrictions imposed by the lower court on appellants' activities *outside* the boundaries of appellees' private property are the prohibition of photographing patients, employees, or staff; the limitation to ten pickets at any one time; the requirement of constant motion and a distance of at least five feet apart; and the prohibition on obstructing ingress and egress to appellees' private property. With these restrictions, appellants are still free to picket and demonstrate along Upland Avenue and its intersection with Seminary Avenue, the main entrance to CCMC and more particularly, to RHCC.

**5.** Appellants frame the issues as follows:
1. Can private property held open to the public for the private gain or advantage of the owner be deemed [an] appropriate forum for the discussion of a relevant public controversy before a relevant audience?
2. Can a privately owned abortion clinic be deemed an appropriate forum for the discussion of abortion and abortion-alternatives counseling in the audience of pregnant women contemplating abortion at this particular abortion clinic?
3. Are appellants entitled to effectively communicate their message to their intended audience as a matter of constitutional law?
4. Is Appellee, CCMC's, "no solicitation" policy a standardless policy that is vague, arbitrarily applied in practice, and therefore unconstitutional?
5. In an injunction proceeding involving constitutional issues, does the moving party have the burden of showing either a "taking" of his private property or a due process violation?
Brief for Appellants at 5.

Essentially we are asked to determine whether the lower court erred in 1) failing to find that at least portions of appellees' private property constitute an appropriate forum for appellants' activities under the federal and/or state constitution; 2) failing to find that CCMC's no solicitation policy is vague, arbitrary, and discriminatory, and therefore unconstitutional; and 3) enjoining appellants from continuing to trespass on appellees' private property.

■ The superior court's scope of review of a decision to grant, deny, or continue an injunction is limited. *Buttonwood Farms, Inc. v. Carson*, 329 Pa.Super. 312, 478 A.2d 484 (1984); *Lazovitz v. Lazovitz*, 307 Pa.Super. 341, 453 A.2d 615 (1982). Our scope of review is restricted to whether there were any apparently reasonable ground for the action taken by the court below. *Hospital Association of Pennsylvania v. Commonwealth, Department of Public Welfare*, 495 Pa. 225, 433 A.2d 450 (1981); *Buttonwood Farms, Inc. v. Carson, supra; Wolf v. Baltimore*, 250 Pa.Super. 230, 378 A.2d 911 (1977). Only if no grounds exist to support the decree of a court of equity, so that its ruling was palpably erroneous or a misapplication of law, will we disturb that court's decision. *Id.* In the absence of a plain indication that no such grounds existed or that the rules of law relied on were wrong or inapplicable, we as the reviewing court will not consider the merits of the case. *Credit Alliance Corp. v. Philadelphia Minit-Man Car Wash Corp.*, 450 Pa. 367, 301 A.2d 816 (1973); *Bliss Excavating Co. v. Luzerne County*, 418 Pa. 446, 211 A.2d 532 (1965). With this standard in mind, we have reviewed the record in the instant case.

> 1. Did the lower court err in not finding that portions of Appellees' property constitute an appropriate forum for Article I, Sections 7 and 20 of the Pa Constitution?
> 2. Did the lower court err in failing to find the application of Appellees' non-solicitation policy to Appellants' activity arbitrary and discriminatory?
> 3. Did the lower court err in not discussing whether Appellees' met their burden of proof for the granting of an injunction?

Brief for Appellants Miriam Andrews and Robert Moran at 3.

Although it is not clear from appellants' briefs, they appear to have substantially abandoned their former reliance on their first amendment rights under the United States Constitution, placing reliance now on any rights they might have under the Pennsylvania Constitution. This was a wise choice, because as the lower court noted, there is abundant authority for the proposition that the property in question here is not subject to first amendment guarantees. The United States Supreme Court has considered the question of when private property, such as a company town, a shopping center or an individual store becomes subject to the first amendment guarantee of freedom of expression. Beginning with *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), in which the Court held that a company-owned town had to allow Jehovah's Witnesses to distribute religious literature on a sidewalk, the Court has gone on to define and clarify that rule. The Court has held that a privately owned shopping center, open to the public, had to permit peaceful picketing by union members concerning the nonunion status of a store within the center, *Amalgamated Food Employees Union Local 509 v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), *overruled in Hudgens v. National Labor Relations Board,* 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); that a privately owned shopping center could prohibit the distribution of handbills which were unrelated to the center's operations, *Lloyd Corp. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972); that before private property, such as a free-standing store, could be subjected to the commands of the first amendment, it had to assume to some significant degree the functional attributes of public property devoted to public use, *Central Hardware Co. v. National Labor Relations Board,* 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972), and finally that a privately owned shopping center, even though open to the public, could prohibit picketing, whether it was related to a store in the center or not, *Hudgens v. NLRB, supra.*

 It is now clear that the first and fourteenth amendments are limitations on state action, not on action by the owner of private property used only for private purposes. *Central Hardware Co. v. NLRB, supra.*

> The free speech provision of the First Amendment ... does not prevent a privately owned and operated shopping center from enforcing nondiscriminatory and nonarbitrary bans on certain forms of activity on its premises. The right of free speech secured by the federal Bill of Rights is held against the government and cannot be unreasonably infringed. In the absence of "state action," however, the acts of purely private actors, such as privately owned shopping centers, do not violate the federal constitution; such enterprises are free to enforce policies banning certain forms of speech activities under federal doctrine. *Hudgens v. NLRB,* 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); *Lloyd Corp. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972).

*Western Pennsylvania Socialist Workers v. Connecticut General Life Insurance Co.,* 335 Pa.Super. 493, 498–99, 485 A.2d 1, 3 (1984) (footnote omitted). Appellants do not argue that state action was involved in the instant case, that question having been determined previously by the federal court in *Cardio-Medical Associates v. Crozer-Chester Medical Center,* 536 F.Supp. 1065 (E.D.Pa.1982), *aff'd in part and rev'd in part, all on other grounds,* 721 F.2d 68 (3d Cir.1983), and *Holton v. Crozer-Chester Medical Center,* 419 F.Supp. 334 (E.D.Pa.1976), *vacated on other grounds,* 560 F.2d 575 (3d Cir.1977).[6] We must agree, therefore, with the lower court's conclusion that appellants

---

**6.** Other federal courts that have considered the question of whether private hospitals act under color of state law because they perform a public function have also concluded that they do not. *See, e.g., Schlein v. Milford Hospital, Inc.,* 561 F.2d 427 (2d Cir.1977); *Taylor v. St. Vincent's Hospital,* 523 F.2d 75 (9th Cir.1975), *cert. denied,* 424 U.S. 948, 96 S.Ct. 1420, 47 L.Ed.2d 355 (1976); *Chrisman v. Sisters of St. Joseph of Peace,* 506 F.2d 308 (9th Cir.1974); *Ward v. St. Anthony Hospital,* 476 F.2d 671 (10th Cir.1973); *Robinson v. Magovern,* 456 F.Supp. 1000 (W.D.Pa.1978); *Sokol v. University Hospital, Inc.,* 402 F.Supp. 1029 (D.Mass.1975); *Barrett v. United Hospital,* 376 F.Supp. 791 (S.D.N.Y.1974), *aff'd,* 506 F.2d 1395 (2d Cir.1974).

have no first amendment rights on the private property owned by appellees.

Appellants argue, however, that appellees' injunction also violates free speech rights conferred upon them by the Pennsylvania Constitution. In *Hudgens v. NLRB, supra,* the Supreme Court left open the question of whether state statutory or common law could extend a person's rights of access and freedom of expression on private property. The Supreme Court answered that question in *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). The Court held that, while the first amendment of the United States Constitution did not grant the right to defendants to solicit in a privately owned shopping center, state law—in that case, the law of California—might grant that right. Thus, the state courts were free to interpret their state constitutions' free speech provisions as guaranteeing greater rights than those established under correlative federal provisions. *Id.; Commonwealth v. Tate,* 495 Pa. 158, 432 A.2d 1382 (1981); *Western Pennsylvania Socialist Workers v. Connecticut General Life Insurance Co., supra.*

Our research, however, has not uncovered any such greater right in Pennsylvania. As we stated in *Western Pennsylvania,* "after careful review of the content and history of Article I of the Pennsylvania Constitution, [we hold] that privately owned shopping centers may constitutionally ban political activity." *Id.,* 335 Pa.Super. at 501, 485 A.2d at 4–5. *See also Logan Valley Plaza, Inc. v. Amalgamated Food Employees Union Local 509,* 425 Pa. 382, 227 A.2d 874 (1967), *rev'd as to federal rights,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), *overruled as to federal rights in Hudgens v. NLRB, supra.*

Contrary to the contention of appellants, the law of Pennsylvania respecting private property rights was not changed by *Commonwealth v. Tate, supra,* in which our supreme court held that on the day in question, the private campus of Muhlenberg College was "open to the public" because it had invited members of the public to a symposi-

um at which a controversial public figure was to speak. Therefore, the defendants, who were peacefully passing out leaflets criticizing the speaker, could not be found guilty of defiant trespass. As we stated in *Western Pennsylvania Socialist Workers v. Connecticut General Life Insurance Co., supra:*

> The Court [in *Tate*] suggested that the college had been a "public forum" and thus a quasi-state actor. The Court appears to have placed the college on a continuum somewhere between the extremes of a state actor, on the one hand, and a purely private actor, on the other. It then found the college closer to the former than the latter. Thus the Court found that the college was a "community center for Allentown," maintaining within a few hundred yards of defendants' arrest a United States Post Office station, a public cafeteria, an information and ticket sales booth for public events, and a federal book depository library required to be open to the public.

*Id.,* 335 Pa.Super. at 505, 485 A.2d at 7.

In *Western Pennsylvania,* we found three instances in which a supposedly private actor has been subject to federal constitutional restraints: 1) where there is a "symbiotic relationship" between a private actor and the government; 2) where there is a sufficient "nexus" between the actor and the government; and 3) where the actor has assumed a "public function", making it an arm of the state for constitutional purposes. *Id.,* 335 Pa.Superior Ct. at 506, 485 A.2d at 7–8.

As in *Western Pennsylvania,* we find in the instant case that there is neither a symbiotic relationship nor a nexus between appellees and state government. Nor do we find that appellees assumed a public function so as to become an arm of the state for constitutional purposes. Similarly, we feel that the college campus in *Tate* is distinguishable from appellees' property. In *Tate,* the court was dealing with a college—a traditional place for free speech and the free exchange of ideas. Appellees' hospital is hardly intended for the same purpose. Additionally, in *Tate* a number of

"public" services, such as a post office, cafeteria, and library, were located at the college. These services are not found at the hospital. Further, while the college in *Tate* permitted a number of private civic groups to use its facilities, here, the hospital does not. In *Tate*, on the day in question, the college had specifically invited the public to attend its symposium. Here, other than its general invitation to the public to do business with it, the hospital has not so invited the public. Finally, the college in *Tate* had no written policy about off-campus visitors, whereas the hospital has a clearly stated written policy of no solicitation.

In the instant case, there is no public figure and no open invitation to the public. Appellees do not invite or encourage the public to congregate upon hospital grounds for the purpose of discussing issues of the day. Appellees' property is open to the public only for the purpose of transacting business. The Pennsylvania Supreme Court has already determined that private shopping centers are not quasi-public entities because the public is invited to enter for purposes of doing business. *Logan Valley Plaza, Inc. v. Amalgamated Food Employees Union, supra; Western Pennsylvania, supra.* Appellants' attempts to analogize this case to the *Tate* case simply do not withstand close scrutiny. We find appellees' property to be more similar to the shopping center of *Western Pennsylvania* or the private store of *Central Hardware, supra,* than the college campus of *Tate.*[7]

Appellant's contention that CCMC's "no solicitation" policy is vague, arbitrarily applied in practice, and therefore unconstitutional, is meritless. The lower court found that at all times material to this case, CCMC "has adopted, pursued and enforced a general hospital policy of permitting no solicitation in or upon its property in the belief that general solicitation is not in the best interest of good patient care." Finding of Fact No. 5, Lower ct. op. at 10.

---

7. We note that the court in *Tate* did not hold Muhlenberg College to be forever or at all times open to the public for the exercise of free speech, but merely on the particular day scheduled for the public symposium.

The court *en banc* found that the evidence showed that CCMC was consistent in applying its no solicitation policy. The record clearly shows that CCMC did not arbitrarily ban appellants' presence due to the content of their speech. *See Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). Rather, it banned all solicitations, although it appears to have tolerated appellants' presence on the sidewalk along Seminary Avenue until appellants began to physically accost the patients and staff and block the entrance to the building. Appellants' reliance upon *Dallas Association of Community Organizations for Reform Now v. Dallas County Hospital District,* 670 F.2d 629 (5th Cir.1982), *cert. denied,* 459 U.S. 1052, 103 S.Ct. 471, 74 L.Ed.2d 619 (1982) is misplaced; the hospital in that case was a public, state-run institution, whereas the instant medical center is private.

■ As the Pennsylvania Supreme Court stated in *Commonwealth v. Tate, supra:*

Even when an owner of private property is constitutionally obligated to honor speech and assembly rights of others, private property rights themselves must nonetheless be protected. The owner of such private property, therefore, is entitled to fashion reasonable rules to control the mode, opportunity and site for the individual exercise of expressional rights upon his property. It is at this level of analysis—assessing the reasonableness of such restrictions—that weight may be given to whether there exist convenient and feasible alternative means to individuals to engage in substantially the same expressional activity.

*Id.,* 495 Pa. at 174–75, 432 A.2d at 1390 (quotations and footnote omitted). Appellants do not convince us that CCMC failed to fashion such reasonable rules or that the restriction of appellants' activities to the public sidewalk adjacent to the hospital grounds does not provide them with a feasible alternative to engage in substantially the same

expressional activity. By being restricted to picketing along the public sidewalk, appellants do not lose their relevant audience, but are seen by virtually anyone entering, exiting, or going by the hospital grounds. The decree allows appellants a reasonable opportunity to voice their opinion while at the same time, the decree respects the rights of the hospital and its patients.

Finally, appellants argue that appellees failed to prove either a taking of their private property without just compensation or a due process violation. For the proposition that appellees, in an injunction proceeding involving a constitutional issue, have the burden of showing either a taking or a due process violation, appellants cite *PruneYard Shopping Center v. Robins, supra* and *Commonwealth v. Tate, supra.* After a close examination of both cases, we conclude that appellants have misread those opinions. There is no *requirement,* placed upon the moving party, that it must prove either a taking or a due process violation before it can obtain injunctive relief.

What appellees needed to prove was the certainty of immediate and irreparable harm and that greater injury would be done by refusing the injunction than by granting it. *Willman v. Children's Hospital of Pittsburgh,* 505 Pa. 263, 479 A.2d 452 (1984). The record clearly shows that these requirements have been met. It also shows that appellees had no adequate remedy at law, and that the injunction would more or less restore the status quo and is reasonably suited to abate the wrongful activity. *See Temtex Products, Inc. v. Kramer,* 330 Pa.Super. 183, 479 A.2d 500 (1984).

■ We conclude that the lower court, after careful consideration of both appellants' rights to voice their opinions and appellees' rights to protect their patients and to conduct their lawful business upon their private property free from unwarranted interference, arrived at a solution which carefully balances the rights of all parties involved. Because we find that there were reasonable grounds for the action

taken below and that there was a proper application of the law, we affirm the final decree of the court below.

Decree affirmed.

BROSKY, J., files a concurring opinion.

BROSKY, Judge, concurring:

I join the majority opinion. I write only to note that our neighboring sister state of New Jersey has already grappled with the issue before us today and has formulated a more powerful analytical test than this Commonwealth's courts have provided in the *Western Pennsylvania—Tate* dichotomy.

In *Brown v. Davis,* 203 N.J.Super. 41, 495 A.2d 900 (1984), New Jersey's counterpart to our Court had before it a case dealing with the right of public access under New Jersey's Constitution to private property to demonstrate against abortions. In deciding that the right was not present under the facts before it, the *Brown* court applied the test laid down by New Jersey's high court in *State v. Schmid,* 84 N.J. 535, 423 A.2d 615 (1980), app. dism. sub nom. *Princeton University v. Schmid,* 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982).

In *State v. Schmid,* where the defendant sought to distribute political literature on the campus of Princeton University, the court formulated a three prong test to ascertain "... the parameters of the rights of speech and assembly upon privately owned property and the extent to which such property reasonably can be restricted to accomodate" those rights. *Id.* 84 N.J. at 563, 423 A.2d 615. The elements to be considered are "(1) the nature, purposes, and primary use of such private property, generally, its 'normal' use, (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property." *Id.* at 563, 423 A.2d 615.

The protection of the rights of a private owner is concomitant to the owner's obligation to honor the rights of others to speak and assemble on his property. In weighing the reasonableness of the owner's restrictions to access to private property, effect must be given to whether "there exists convenient and feasible alternative means to individuals to engage in substantially the same expressional activity." *Schmid* at 563, 423 A.2d 615.

*Brown,* 495 A.2d at 903.

The *Schmid* analysis makes explicit the factors that are implicit in *Western Pennsylvania, Tate* and the majority opinion. It is, consequently, a more useful tool. Using it, I come to the same conclusion as the majority.