# Flax v. Reconstructionist Rabbinical College

*Stephen G. Heckman,* for plaintiff.
*James M. Penny Jr.,* for defendant.

BRODY, *J.,* June 1, 1987—This case involves the interesting question of whether the First Amendment of the United States Constitution precludes this court from ordering a private religious seminary, in this case defendant Reconstructionist Rabbinical College, from reinstating a former student at the Seminary, plaintiff Ira Flax, as a seminarian into its rabbinic program.

On December 9 and 10, 1986, the court tried Flax's motion for preliminary injunction. Flax requested that RRC, which allegedly dismissed him as a student for poor academic performance, reinstate him into its rabbinic program. By order dated January 20, 1987, I denied Flax's motion for a preliminary injunction based upon the constitutional principle of autonomy in matters involving internal sectarian disputes. Flax now appeals from my order to the Superior Court.

## FINDINGS OF FACT

The RRC is a private, non-profit corporation organized under the laws of Pennsylvania for the ex-

press purpose of training "rabbis for service in every aspect of the Jewish community and at the same time to equip them with the necessary academic training which would qualify them to teach Jewish studies at a college or university. . . ." The seminary is affiliated with the Jewish Reconstructionist Movement and the Jewish Reconstructionist Foundation.

Reconstructionist Judiasm perceives itself as the fourth, and newest, of the religious movements within Judiasm, the others being the Orthodox, Conservative and Reform movements. Reconstructionist Judiasm defines Judiasm as the evolving religious civilization of the Jewish people. The Jewish Reconstructionist Foundation is an umbrella organization, founded in 1940, under which operate the various arms of the Reconstructionist Movement, with the RRC as the seminary arm.

Since its founding in 1968, the seminary has ordained rabbis to serve the Jewish community. In 1982, the Pennsylvania Department of Education licensed and authorized the seminary to confer the academic degrees of Master of Arts in Hebrew Letters and of Doctor of Hebrew Letters. The RRC currently holds candidacy status for accreditation with the Commissioner on Higher Education of the Middle States Association of Colleges and Schools, the academic accreditation body for this area of the country. The seminary offers no secular courses as such; rather, every course is taught from the perspective of training the seminarian for the religious ministry.

Plaintiff, was a seminarian at the RRC who was accepted into the seminary's six-year rabbinic program by letter from the registrar dated March 12, 1982. Flax applied to the RRC because he wanted to become a rabbi and because the religious philos-

ophy of Rabbi Mordecai Kaplan, founder of Jewish Reconstructionism, personally appealed to him. The RRC's letter of acceptance advised Flax that his matriculation was subject to his acceptance into an outside graduate program and quoted the following extract from the student handbook then in effect: "Students are admitted to the college with the understanding that by the end of the second year [of the rabbinical program], the faculty will review the progress of each student to determine whether the student will be permitted to continue in the program."

Flax began his studies at the seminary in September 1983. At that time, the RRC's grading system consisted of both a written evaluation and a grade of pass or fail for each academic course. For the Fall semesters of 1983 and 1984 and the Spring semesters of 1984 and 1985, plaintiff received a "pass" in each of his 15 courses. However, his professors frequently criticized Flax for tardiness, poor attendance and poor preparation.

As a result of these problems, the RRC placed Flax on probation in 1984. He was never told that his probation was due to an inability to understand the academic material or an inability to pass his courses. There was conflicting testimony about whether Flax was removed from probation in June 1985, but in any case, Flax's probation was "reinstated" as of December 11, 1985.

Effective September 4, 1985, by faculty vote, RRC's grading system was changed to a pass/low pass/fail system. Shortly thereafter, Dr. Rebecca T. Alpert, dean of students at the RRC, informed students of the change in the grading system by distributing a revised page nine to the student handbook to each student through the student mailbox system and by explaining the change at a meeting

of the student association. Flax and several other RRC students testified that, in the fall of 1985, they neither received any revision as to RRC's grading policy nor did their classroom professors define the grade of "low pass."

Toward the end of Flax's fifth semester at RRC, the faculty determined that, as Flax's problems persisted, Flax must receive all passes — no "low passes" — for that semester in order to continue his training at the seminary. Further, even if he received all "passes," he would still remain on probation for a period not to exceed the spring of 1986, with the understanding that at the end of that semester if he received all "passes" he would be removed from probation; otherwise he would be expelled. Plaintiff also would not be allowed any of the routinely granted extensions of time in which to submit any papers in the courses he attended. Flax learned of this faculty decision by letter dated December 11, 1985. Flax testified that this was the first time he was ever advised that a low pass grading system was in effect in any of his classes or specifically that his academic performance was a problem.

For the Fall semester 1985, Flax received one "pass" grade, two "low pass" grades, and two "incompletes." His grades during the four preceding semesters were all "pass" grades; he never received a grade of "fail." Flax was dismissed from the seminary on February 5, 1986, by unanimous vote of the faculty on a motion seconded by Flax's faculty advisor. Flax subsequently filed the instant lawsuit.

Under the revised grading system, effective as of the Fall semester of 1985, unless permission was granted by the faculty, no student would be allowed to remain in the RRC program if he or she received either: (1) a "low pass" in three semester courses,

with the grade of "low pass" given by more than one instructor in more than one semester, or (2) a grade of "fail" given by more than one instructor. Flax received only two "low pass" grades and no failures during his five semesters at the seminary, yet was expelled. The seminary clearly violated the express provisions of its own student handbook.

The seminary prepares and distributes the student handbook to its students for informational purposes. As to academic and administrative matters, the provisions of the handbook are drafted, adopted, and revised by the faculty and administration of the college. Although student opinion on such matters may be solicited by the faculty, authority to promulgate and revise academic policy or practice exclusively resides in the faculty and administration.

Other RRC students, with grades below those of plaintiff and who were eligible for expulsion under the revised provisions of the student handbook, were not in fact expelled. For example, student "yellow" had three "low passes" and was on probation; student "red" was on probation and had four failures. Neither student was expelled from the college, despite the fact that student "red" certainly qualified for expulsion under the revised student handbook provisions.

That the purpose of the low pass system was to provide a warning to the student and not an expulsion is made clear in the September 4, 1985, minutes of the faculty meeting, where one professor stated that he "assumed no student with two low passes would go without trying to remedy the situation; it should be difficult for a student to accumulate three low passes." Flax was not given an opportunity to remedy his two grades of "low pass." Rather, the low pass system was used punitively in his case. For it was on December 4, 1985, with only

three class weeks remaining, that the faculty specially legislated for Flax and voted to expel him if he received but one "low pass" — that is, two "low passes" fewer than all other students were permitted to receive under the guidelines of the revised student handbook.

## DISCUSSION

### A. *Standard of Review*

While the trial court's discretion in granting or denying a preliminary injunction is broad, the Superior Court's scope of review is very narrow. The standard of appellate review on the grant or denial of a preliminary injunction is limited to whether "any apparently reasonable grounds" for the lower court's action existed. *Fischer v. Department of Public Welfare,* 497 Pa. 267, 270, 439 A.2d 1172, 1174 (1982); *Valley Forge Historical Society v. Washington Memorial Chapel,* 493 Pa. 491, 500, 426 A.2d 1123, 1128 (1981); *Crozer Chester Medical Center v. May,* 352 Pa. Super. 51, 56, 506 A.2d 1377, 1379 (1986). Unless the record reveals a clear or manifest abuse of discretion or palpable legal error by the lower court, the reviewing court shall affirm the lower court's decision without considering the merits of the case. *Crozer Chester Medical Center v. May,* 352 Pa. Super at 56, 506 A.2d at 1379-80; *Buttonwood Farms Inc. v. Carson,* 329 Pa. Super. 312, 315, 478 A.2d 484, 485 (1984).

### B. *Legal Analysis*

The fundamental legal and constitutional question for the court is whether the First Amendment to the United States Constitution precludes this court from reviewing a seminary's decision to expel a seminarian from a program of religious study lead-

ing to ordination as a religious minister. The First Amendment prohibits Congress from making any "law respecting establishment of religion or prohibiting the free exercise thereof. . . ." Plaintiff argues that the sole issue here is one of contract interpretation — whether or not RRC violated the principles of fair dealing and breached its own student handbook — and not one of religious doctrine; plaintiff claims that First Amendment values are not implicated and there is no hazard of inhibiting the free development of religious doctrine. That is not the case.

Only a minimal factual predicate is necessary to support the First Amendment's prohibition of this court's review of the seminary's decision. The RRC is a rabbinic seminary; it is an arm of the religious movement known as Jewish Reconstructionism. Its sole purpose is to train seminarians for rabbinic service; no secular courses are taught at the RRC. Flax was a seminarian who attended the RRC because of his desire to become a rabbi and because the teachings of Rabbi Mordecai Kaplan, founder of Jewish Reconstructionism, personally appealed to him. On this record, it is clear that the relationship sued upon is one between a seminary and a seminarian.

The case law on this issue is overwhelmingly clear — this court may not review, much less reverse, the seminary's decision to terminate plaintiff's studies in the religious ministry. The seminary's decision is inherently and necessarily a religious decision with which the state cannot interfere.

Plaintiff asks this court to reinstate him into the seminary's rabbinical program based upon a breach of contract. Regardless of the basis for plaintiff's request, such an adjudication would require our in-

quiry into whether the seminary's dismissal of plaintiff was proper. Such a determination would have this court effectively deciding who is to be trained and ordained as a rabbi. Such "an encroachment by the state into an area of religious freedom . . . is forbidden . . . by the principles of the free exercise clause of the First Amendment." *McClure v. Salvation Army,* 460 F.2d 553, 560 (5th Cir.), cert. denied, 409 U.S. 896 (1972). Such a question is one the First Amendment properly leaves to religious officials and not to the government.

The law in our country has long been that the state has no business interfering with or involving itself in the practice of religion.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism [or] religion." *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 642 (1943). The First Amendment requires judicial deference to matters of church doctrine, church government and church administration. Indeed, the constitutional guarantee of freedom of religion, of absolute autonomy in matters involving internal sectarian disputes, has been repeatedly upheld even in the face of competing governmental interests of paramount importance (e.g., eradication of racial discrimination; *Simpson v. Wells Lamont Corp.,* 494 F.2d 490 (5th Cir., 1974); *40th Street and Fairmont Avenue Church of God v. Stover,* 316 F. Supp. 375 (E.D., Pa., 1970)).

The operation of a seminary like the RRC, whose singular purpose is to train rabbinic students for ordination into the religious ministry, is an "ultimate religious activity entitled to the highest degree of first amendment protection." *Equal Employment Opportunity Commission v. Southwestern Baptist*

*Theological Seminary*, 485 F. Supp. 255, 260 (N.D. Tex., 1980), aff'd in part, 651 F.2d 277 (5th Cir., 1981). As was eloquently stated by the district court in *EEOC v. Southwestern Baptist* (which held, inter alia, that Title VII did not apply to the employment relationship between a seminary and its faculty):

"The risk of unseemly governmental entanglement increases exponentially as the function of an institution becomes more fundamentally and pervasively religious. The originative power of any religion lies in the institution that schools its ministers, preserving and transmitting dogma in a pure form in the academic sense and endeavoring to animate sterile doctrine into communicable faith. A seminary's function within a particular religion is to replenish the core of faithful who provide its structure, a role even more essential to its mission than that served by parochial elementary and secondary schools. . . . and one qualitatively different than that of religiously affiliated colleges offering liberal arts or other secular courses of study to the public. . . . The operation of a seminary is an ultimate religious activity entitled to the highest degree of first amendment protection." Id. at 260.

This is not an appropriate case for application of the "neutral principles approach" to First Amendment issues that is urged by plaintiff. That approach, delineated in *Presbyterian Church in the United States v. Blue Hull Memorial Church*, 393 U.S. 440 (1969), permits a civil court to adjudicate wholly secular disputes involving a religious organization, but only if such disputes may be adjudicated "without resolving underlying controversies over religious doctrine." Id. at 449. In that case, the court explained the "neutral principles" approach:

"[T]he First Amendment severely circumscribes the role that civil courts may play in resolving

church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes [citation omitted]; it therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Id. at 449.

In a later decision, *Jones v. Wolf*, 443 U.S. 595 (1979), the court explained that the "neutral principles" approach is "completely secular in operation (and) relies exclusively on objective, well established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, policy and practice." Id. at 603. The court makes clear that this neutral principles approach is a narrow exception to the general "deference" rule governing religion-related disputes, and that, constitutionally, the neutral principles ap-

proach may only be employed in the limited context where the disputed issues are amenable to resolution without also implicating, directly or indirectly, any religious matters whatsoever.

The *Jones* court further explained that if a court's examination of a religious institution's deed, corporate charter, or constitution cannot be undertaken in "purely secular terms" or "would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." Id. at 604, citing *Serbian Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 709 (1976). In *Milivojevich,* the Supreme Court held that the Illinois Supreme Court had violated the First Amendment freedom of religion clause by (1) engaging in a detailed review of church procedures to determine if, in the course of proceedings to remove a bishop, those procedures had been followed, and then (2) ordering the bishop's reinstatement on the basis that the procedures had not been followed.

The Pennsylvania Supreme Court, in a 1985 decision, is completely in accord with this view of the limited applicability of the neutral principles approach. *Presbyterian of Beaver-Butler v. Middlesex,* 507 Pa. 255, 489 A.2d 1317 (1985). The *Middlesex* decision involved "a pristine question of property control." Id. at 1323. The court held that only in those cases "where the resolution of a property dispute involves *no inquiry into ecclesiastical questions* (may the) courts of this commonwealth . . . apply the same principles of law as would be applied to non-religious associations." Id. (footnote omitted) (emphasis added).

Resolution of plaintiff's claim here does not fall under the "neutral principles" approach, as the issues here involve inquiry into completely *non*-secu-

lar areas. The decision complained of in this case concerns the seminary's assessment of Flax's fitness for the religious ministry; such a decision necessarily involves inquiry of religious policy and practice, since it involves Reconstructionist Judaism's decisions as to who will become its rabbis.

Like the bishop in *Milivojevich,* supra, Flax wants this court to engage in a detailed review of the circumstances which led to Flax's dismissal to determine if the seminary followed the provisions set forth in its own handbook. And, like the bishop in *Milivojevich,* Flax wants this court to reinstate him because the seminary failed to comply with its internal procedures. However, as the higher courts have unequivocally ruled, this court cannot review the seminary's inherently religious decision regarding who shall, and who shall not, become its rabbis; instead, the court must defer to the seminary's judgment.

## CONCLUSION

For the above reasons, this court's order denying plaintiff's motion for a preliminary injunction should be affirmed.